# WESTPORT TAXI SERVICE, INC. *v.* WESTPORT TRANSIT DISTRICT
## (15199)

Callahan, Borden, Berdon, Norcott and Schaller, Js.

1

Argued April 21—decision released August 15, 1995

*George J. Markley*, with whom, on the brief, was *Gregory C. Hammonds*, for the appellant (defendant).

*David S. Golub*, with whom was *Jonathan M. Levine*, for the appellee (plaintiff).

BERDON, J. In this appeal, we must decide whether the trial court properly imposed liability upon the defendant under the Connecticut Antitrust Act (act); General Statutes § 35-24 et seq.; and, if so, whether the trial court properly awarded the plaintiff treble damages, including lost profits, business value and prejudgment interest, totaling $1,048,260.96.

The plaintiff, Westport Taxi Service, Inc., brought this action against the defendant, Westport Transit District, claiming that the defendant had intentionally engaged in monopolistic practices in violation of the act. The plaintiff sought treble damages, attorney's fees and costs pursuant to General Statutes § 35-35[1] of the act.[2] The trial court found that the defendant had engaged in monopolistic practices, and awarded damages to the plaintiff for lost profits, the value of the plaintiff's business and prejudgment interest.[3] The court then trebled the total damage award. We affirm the trial court's judgment except as it pertains to the award of prejudgment interest.

---

[1] General Statutes § 35-35 provides: "Treble damages for injury to business or property. The state, or any person, including, but not limited to, a consumer, injured in its business or property by any violation of the provisions of this chapter shall recover treble damages, together with a reasonable attorney's fee and costs."

[2] In addition to claiming that the defendant had violated the act, the plaintiff claimed that: (1) the defendant's conduct constituted a taking of the plaintiff's franchise and business, and that the plaintiff was entitled to adequate compensation; (2) General Statutes § 7-273e entitles the plaintiff to just compensation from the defendant for the taking of its taxi franchise; (3) the defendant's conduct constituted willful and wanton interference with the plaintiff's economic relations; and (4) the defendant's conduct violated the Connecticut Unfair Trade Practices Act. General Statutes § 42-110g. The trial court did not address these claims.

[3] We note that the record does not disclose the disposition of the claim for attorney's fees.

The trial court found the following relevant facts. From 1969 until 1978, the plaintiff provided taxi services to the Weston and Westport areas[4] pursuant to a certificate of public convenience and necessity issued by the Connecticut public utilities commission (commission) pursuant to General Statutes (Rev. to 1958) § 16-320.[5] Anthony and Michael Gilbertie each owned 50 percent of the plaintiff corporation's stock and served as president and vice president, respectively. The Gilberties actively managed the business and regularly worked as dispatchers.

Under § 16-320, no person, association or corporation was permitted to operate a taxi service without first obtaining a certificate of public convenience and neces-

---

[4] The business actually had begun many years earlier. The Gilbertie family, who owned and operated the plaintiff corporation, originally purchased the taxi business in 1955 and operated it as a sole proprietorship until it was incorporated in 1968.

[5] General Statutes (Rev. to 1958) § 16-320, now codified at § 13b-97, provides: "No person, association or corporation shall operate a taxicab until such person, association or corporation has obtained a certificate from the commission certifying that public convenience and necessity require the operation of a taxicab or taxicabs for transportation of passengers, the acceptance or solicitation of which originates within the territory specified in such certificate. Such certificate shall be issued only after written application for the same has been made and public hearing held thereon. Upon receipt of such application, the commission shall fix a time and place of hearing thereon and shall give notice of the pendency of such application and of the time and place of hearing thereon to such applicant, the mayor of each city, the warden of each borough or the first selectman of each town in which the applicant desires to originate the transportation of such passengers, and to any common carrier operating within the territory specified. Any town, city or borough within which taxicab service is operated or any interested party may bring a written petition to the commission in respect to fares, service, operation or equipment or the convenience, protection and safety of passengers and the public. Thereupon, the commission shall fix a time and place for a hearing upon such petition, and shall mail notice thereof to the parties in interest and give notice thereof at least one week prior to such hearing. No certificate shall be sold or transferred until the commission, upon written application to it setting forth the purpose, terms and conditions thereof, after investigation, approves the same. The commission may amend or, for sufficient cause shown, may suspend or revoke any such certificate."

sity from the commission.[6] Before it issued a certificate, the commission was required to determine the number of taxicabs and the type of taxi service that the community needed, and it was also required to limit the service authorized according to the community's needs. The plaintiff's certificate permitted it to provide three types of taxi service: premium ride service involving the transportation of a single fare; shared ride service involving the transportation of multiple fares; and package delivery. During the 1970s, there was a substantially larger demand for shared ride service, and this constituted the major part of the plaintiff's business.

In addition to regulating the number of taxis permitted to operate, the commission regulated the rates that were chargeable within a given locality. General Statutes (Rev. to 1958) § 16-319 et seq. The commission adopted the regulatory philosophy that competition among taxi operators was to be with regard to quality of service rather than price. Therefore, the commission required all operators within a given locality to charge the same rates. In determining the appropriate rate structure, the commission considered whether, given the number of vehicles, the rates would permit a reasonable return to the operator on its investment. Certified taxi services were not permitted to charge rates that were lower than those approved by the commission. The last fare increase that the plaintiff had requested was granted by the commission on September 15, 1970, and permitted the plaintiff to charge $1.70 for a three mile one-way trip. In addition, beginning in the fall of 1975, the commission permitted all taxi services in Connecticut to charge an additional ten cents per fare.

---

[6] In 1979, the department of transportation assumed the statutory responsibilities of the public utilities commission with respect to taxis. See General Statutes § 13b-97.

The defendant was formed in 1969, pursuant to General Statutes (Rev. to 1966) § 7-273b.[7] Initially, pursuant to a financial grant from the federal Urban Mass Transportation Authority (transportation authority), the defendant had intended to establish only a fixed route bus service in Westport.

Because the Gilberties were aware of these plans, they did not seek additional fare increases from the commission. The Gilberties hoped that, by maintaining the plaintiff's rates, they would remain competitive and minimize the negative impact they predicted that the bus service would have on the local private taxi operators. On August 11, 1974, the defendant instituted its "Minnybus" service, and the plaintiff's ridership and revenues initially decreased. The plaintiff expanded its services within the Westport area, however, and, in 1976, as a result, increased its revenues over those earned in 1973 and 1974. The trial court determined, therefore, that the defendant's implementation of the Minnybus service did not ultimately cause the plaintiff to go out of business. The plaintiff's increase in revenues, however, was at the expense of Teddy's Taxi, the only other taxi service in the Westport area.

When the defendant first commenced the Minnybus service, both the plaintiff and Teddy's Taxi complained to the defendant about the deleterious effects that the

---

[7] There was no evidence presented at trial regarding how the defendant was actually created. It is clear, however, that the defendant applied for and received federal funding as a transit authority and functioned as a transit authority. Therefore, the trial court reasonably assumed, as do we, that the defendant was formed pursuant to General Statutes (Rev. to 1966) § 7-273b, which provides in relevant part: "Formation of district. (a) Any town, city or borough may, by itself or in cooperation with one or more other municipalities, form a transit district, in the manner and for the purposes hereinafter provided. The inhabitants of the municipality or municipalities forming the district shall be a body corporate and politic, and may sue and be sued, plead and be impleaded, hold and convey real or personal estate and adopt and alter a common seal."

Minnybus initially had on their businesses. In response, in 1975, the defendant applied for, and obtained, an additional $25,000 grant from the transportation authority ostensibly to conduct a study to determine how to remedy that initial negative impact its bus service was having on the private taxi operators. The plaintiff cooperated fully, permitting the defendant access to all its records and books. The information that was made available to the defendant included equipment and employee records, trip data, operating and capital costs, revenue data and ridership data. The study revealed that together the plaintiff and Teddy's Taxi averaged between 200 and 250 trips per day but that, because the companies were operating under a 1970 fare schedule during a highly inflationary period, the companies were subsisting at a marginal level.

The results of the study prompted the defendant to apply for an additional grant from the transportation authority to fund a project for a proposed transportation system that would integrate bus and taxi services under the defendant's auspices and provide all the services that the plaintiff offered. In its application, the defendant represented that it intended substantially to take over all the private taxi business in Westport and assume the regulatory powers of the commission under General Statutes (Rev. to 1975) § 7-273d.[8] The defendant repre-

---

[8] General Statutes (Rev. to 1975) § 7-273d provides in relevant part: "Assumption of public utilities commission powers relative to transit system within district. Appeals. Upon written notice to the public utilities commission, to the chief executive officer of a private transit system, and to the elected chief executive officer of each municipality composing the district, the district, by its board of directors, may assume all powers of the public utilities commission to regulate and supervise the operation of any such transit system within the district, provided that such transit system would be subject to the supervision of the public utilities commission except for this section. Upon assuming such supervision the district, by its board of directors, shall establish passenger fares and any other rates to be charged and shall establish service standards, may order abandonment of uneconomic routes and shall exercise all powers of regulation and supervision over such transit system

sented that it intended to revoke the certificates of the private companies and issue new certificates to them that would exclude shared ride service. Under General Statutes (Rev. to 1977) § 7-273e (c), if the defendant were to acquire by eminent domain the plaintiff's right to provide shared ride service, the defendant would have been required to compensate the plaintiff.[9] Furthermore, the defendant represented that it intended to consolidate

as are conferred on the public utilities commission by title 16, in the same manner and under the same standards are established by said title 16. Any company, town, city, borough, corporation or person aggrieved by any order, authorization or decision of the board of directors, except an order, authorization or decision approving the taking of land, in any matter to which he or it was or ought to have been made a party, may appeal therefrom to the public utilities commission within thirty days after the filing of such order, authorization or decision. . . ."

[9] General Statutes (Rev. to 1977) § 7-273e provides in relevant part: "(b) In order to insure the continuance of adequate transit services when it appears that the holder of the franchise is or will be incapable of continuing to offer satisfactory service to meet present or future public passenger transportation requirements and it is improbable that such franchise will be sought by any other private concern, the public utilities control authority, on its own initiative, may or, on request of the transit district or the legislative body of one or more municipalities in the area served, shall fix a time and place for a hearing as to whether such franchise is suitable for acquisition by a transit district. Said authority shall give written notice of such hearing to the board of selectmen of each town, or in the case of cities and boroughs to the chief executive of each, within the area not less than fourteen days prior to such hearing, and shall cause to be published twice, not more than fourteen nor less than seven days prior to such hearing, notice of such hearing in a newspaper or newspapers having a substantial circulation in each municipality within such area. Suitability of a franchise for acquisition by a transit district shall be determined from the following considerations: (1) That public convenience and necessity require the continuance of transit service within the area, (2) that the present franchise holder is or will be incapable of continuing to offer satisfactory service, (3) that it is improbable that such franchise will be sought by a private concern and (4) that continuance of transit service may require the operation of such service by a transit district. After a public hearing thereon and consideration of the above-mentioned factors, the public utilities control authority may declare such franchise suitable for acquisition by a transit district, provided such declaration shall not affect the authority of the municipalities in the area to establish such a district. Ability to offer satisfactory service shall be based upon the financial stability of the franchise holder as determined from past, current and projected net income and from

the dispatching services of the plaintiff and Teddy's Taxi into one service provided by the defendant. The defendant also represented that for the first year of its operations, it would offer the contract for providing shared ride service to one of the two private taxi companies then operating in Westport. Because the transportation authority was concerned about the impact that a government subsidized transit authority could have on private operators, the defendant's representation in its application about its intended treatment of the existing franchises was critical to the defendant's ability to obtain the federal grant.

After the defendant completed its study and before it received the federal grant to expand its services, the

an estimate of financial ability to meet future public passenger transportation requirements in the area. The public utilities control authority may make periodic inspections of transit system franchise holders to determine the financial stability of each and for this purpose may examine the books, accounts and other pertinent documents of such franchise holders and shall have the power to compel the attendance of witnesses and the production of books, accounts and other pertinent documents by the issuance of a subpoena.

"(c) A transit district shall have the power to acquire real property and interests and rights in real property by eminent domain in the name of the transit district for the purposes of the transit district subject to the prior approval of the legislative body or bodies of the municipality or municipalities in which the real property is located. The owner shall be paid by the transit district for all damages. Where the transit district and the owner of such property cannot agree upon the amount to be paid to the owner for any property thus taken, the transit district shall proceed in the same manner specified for redevelopment agencies in accordance with sections 8-129 to 8-133, inclusive. Where the public utilities control authority has determined that a franchise is suitable for acquisition pursuant to subsection (b) of this section, the transit district shall have the power to acquire by eminent domain all or any part of the franchise and of the holder's transit system, including the holder's real estate or interests therein, personal property, and funds under the control or held for the use of or the benefit of such holder. Where the transit district and the holder of such franchise and property cannot agree upon the amount to be paid to the holder for any franchise or property thus taken, the transit district shall proceed in the same manner specified for redevelopment agencies in accordance with sections 8-129 to 8-133, inclusive."

defendant's executive director, Richard H. Bradley, notified the Gilberties of the defendant's intentions to establish a taxi service, which eventually became known as the "Maxytaxy," and to eliminate the plaintiff's certificate of public convenience and necessity. Bradley informed the Gilberties that the defendant proposed to hire them as salaried employees, but neither Bradley nor any other representative of the defendant ever offered to compensate the Gilberties for the proposed elimination of the plaintiff's certificate or the value of their business. The Gilberties informed Bradley that they were unwilling to give up their business without compensation and that they chose to remain independent businessmen. The trial court found that "[w]hen the Gilberties expressed their unwillingness to give up their own business without compensation and their desire to remain independent businessmen, Mr. Bradley stated, 'We are going to run this thing at below cost fares. You can't compete with us. . . . We are going to put you out of business . . . .' "

In the summer of 1976, the transportation authority approved a $635,000 grant to fund the defendant's project, and in December, 1976, the defendant executed a contract with the federal government for the implementation of the project, including the Maxytaxy. The contract included a clause that obligated the defendant to comply with the terms of its application, which were incorporated by reference into the contract.

In early 1977, pursuant to a complaint from the private operators that the defendant intended to operate taxis without the commission's authority, an investigator from the commission visited the defendant and the private taxi operators of Westport. The investigator, Robert L. Cumpstone, concluded that the services the defendant intended to provide were the same as those provided by the private taxi operators but that, under General Stat-

utes (Rev. to 1977) § 7-273b (g),[10] the defendant was exempt from regulation by the commission.[11]

In April, 1977, the defendant began providing taxi services. The defendant offered substantially the same services as the plaintiff and competed for the same customers at substantially lower rates. Accordingly, the defendant's ridership increased and the plaintiff's ridership declined. The defendant never assumed the regulatory powers of the commission.[12] Consequently, it also failed to eliminate the plaintiff's certificate and issue a more limited permit, acts which would have required the defendant to compensate the plaintiff. Furthermore, the defendant awarded the shared ride service contract to a newly formed company, Westport Transport Corporation, and not to the plaintiff or Teddy's Taxi as it had asserted in its agreement with the transportation authority.

The plaintiff discontinued its taxi operations in May, 1978. Teddy's Taxi had discontinued its taxi operations one month earlier. In 1978, after the plaintiff had closed its business, the defendant increased its rates 28 percent and thereafter continued to raise its prices. The plaintiff brought this action against the defendant in 1979. Subsequently, on September 22, 1989, the plaintiff amended its complaint and the case was heard by the trial court in January, 1991.

[10] General Statutes (Rev. to 1977) § 7-273b (g) provides in relevant part: "Whenever any transit district is formed under the provisions of this chapter, no provision of [chapter] . . . 287 [regulation of taxicabs] . . . shall apply to the operation of transit systems by such district."

[11] Cumpstone testified that, had the defendant been subject to regulation by the commission, it would not have received permission to operate the number of vehicles it proposed because Westport's requirements did not justify the increases. Furthermore, he stated that the commission would not have approved the defendant's rates because they were below cost and below existing rates.

[12] If the defendant had assumed the commission's regulatory powers, the plaintiff would have had a right to appeal from the defendant's actions. See footnote 8.

The trial court found that the evidence of the defendant's intentional anti-competitive conduct for the purpose of monopolizing the Westport taxi business was overwhelming. The trial court determined that the defendant knew that the plaintiff would not be able to compete with government subsidized, below cost taxi rates, and that the defendant had instituted such fares in order to put competing taxi companies out of business and monopolize the market for taxi services in Westport. The trial court found that once the defendant had eliminated its competition, it had intended to raise rates so that it would no longer require federal government subsidies.

The court also found that the defendant had acted upon its monopolistic intent, had forced the plaintiff out of business by virtue of predatory pricing, and that, after the defendant had monopolized the taxi services in Westport, it had raised its prices substantially.[13] The trial court concluded that the defendant had engaged in both attempted monopolization and actual monopolization in violation of General Statutes § 35-27 of the act.[14] After considering and rejecting the defendant's special defenses, the trial court concluded that the plaintiff was entitled to damages for: lost profits from April, 1977, through May, 1978, the period during which the defendant directly competed with the plaintiff, in the amount of $12,144; the value of the business in the amount of

---

[13] The trial court further found that the defendant had misrepresented its intended treatment of the plaintiff to the transportation authority in order to obtain funding for the project. Because the transportation authority is concerned about the impact that government subsidized transport districts may have on private operators, it evaluates this impact when considering an application for a grant. Although the defendant's application assured that private operators would receive fair treatment, the trial court found that the defendant had failed to comply with these assurances.

[14] General Statutes § 35-27 provides: "Monopolization or attempt to monopolize unlawful. Every contract, combination, or conspiracy to monopolize, or attempt to monopolize, or monopolization of any part of trade or commerce is unlawful."

$150,000; prejudgment interest of $14,026.32 on lost profits; and prejudgment interest of $173,250 on the value of the business. The court further concluded that the plaintiff was entitled to recover treble damages under § 35-35 and awarded the plaintiff damages totaling $1,048,260.96.[15]

The defendants appealed from the judgment of the trial court to the Appellate Court, and the appeal was transferred to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c). On appeal, the defendant claims that the trial court improperly: (1) determined that the defendant had engaged in predatory pricing in violation of the act; (2) rejected the defendant's alleged defense of governmental immunity; (3) awarded the plaintiff damages based on speculative assumptions; and (4) awarded prejudgment interest from 1978.[16] We address the defendant's claims in the order in which they are raised.

---

[15] The trial court arrived at this figure as follows:

| | |
|---|---|
| $ 12,144.00 | Lost profits |
| 14,026.32 | Prejudgment interest on lost profits |
| 150,000.00 | Value of business |
| 173,250.00 | Prejudgment interest on value of business |
| $349,420.32 | Subtotal |
| multiplied by 3 | Trebled |
| $1,048,260.96 | Total treble damages |

[16] The defendant also claims that the trial court improperly based its conclusion that the defendant had violated the act on its determination that the defendant had the power to acquire the plaintiff's franchise and should have exercised that power. This claim mischaracterizes the opinion of the trial court and we conclude that it is without merit. The court based its findings of monopolistic intent upon the actions and statements of the defendant relating to achieving domination of the relevant market and driving competitors out of business. Furthermore, the trial court determined that the defendant's predatory pricing was anti-competitive and illegal. On that basis, the court imposed liability upon the defendant. The defendant's failure to acquire the plaintiff was not a significant factor in the trial court's analysis of this issue and we need not address it further.

In addition, the defendant claims that the trial court improperly trebled the prejudgment interest award. Because we conclude that the plaintiff is not entitled to prejudgment interest, we do not address this claim.

I

We begin our analysis by setting forth our standard of review and the construction that guides our interpretation of the act. "The scope of our appellate review depends upon the proper characterization of the rulings made by the trial court. To the extent that the trial court has made findings of fact, our review is limited to deciding whether such findings were clearly erroneous. When, however, the trial court draws conclusions of law, our review is plenary and we must decide whether its conclusions are legally and logically correct and find support in the facts that appear in the record." (Internal quotation marks omitted.) *Gateway Co.* v. *DiNoia*, 232 Conn. 223, 229, 654 A.2d 342 (1995); Practice Book § 4061. "This court cannot retry the facts or pass upon the credibility of the witnesses." *Holy Trinity Church of God in Christ* v. *Aetna Casualty & Surety Co.*, 214 Conn. 216, 223, 571 A.2d 107 (1990). Furthermore, "[o]ur function is not to examine the record to see if the trier of fact could have reached a contrary conclusion." (Internal quotation marks omitted.) *Ranciato* v. *Nelson*, 36 Conn. App. 678, 680, 654 A.2d 358, cert. denied, 233 Conn. 911, 659 A.2d 184 (1995). "A finding of fact is clearly erroneous when there is no evidence in the

Finally, the defendant claims that the trial court improperly awarded treble damages against it because it was a government agency against which such damages may not be awarded unless there is explicit statutory authority for such an award. For the same reasons set forth in part III of this opinion in which we decline to review the defendant's claim that it is shielded from liability by governmental immunity, we likewise do not review this claim. It was not raised before the trial court, either by special pleading or otherwise, and the record does not indicate the nature of the defendant with respect to its governmental characteristics. See footnote 25.

The plaintiff raises as an alternate ground for affirmance that the trial court properly awarded the plaintiff compensation because the defendant infringed on the plaintiff's property right to be free from competition absent a finding of public convenience and necessity. Because we affirm the treble damages awarded by the trial court, with the exception of prejudgment interest, we do not reach the alternate ground for affirmance.

record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Citation omitted; internal quotation marks omitted.) *Dornfried* v. *October Twenty-Four, Inc.*, 230 Conn. 622, 636, 646 A.2d 772 (1994). Because it is the trial court's function to weigh the evidence and determine credibility, we give great deference to its findings.

The legislative history of the act clearly establishes that it was intentionally patterned after the antitrust law of the federal government. See 14 H.R. Proc. Pt. 9, 1971 Sess., p. 4182, remarks of Representative David H. Neiditz ("this bill gives Connecticut an Anti-Trust Law similar to the existing Federal Anti-Trust Law in every respect"); 14 S. Proc., Pt. 7, 1971 Sess., p. 3211, remarks of Senator William J. Sullivan ("[the proposed act] gives the small businessman the protection afforded to the large corporations under the Federal Anti-Trust Act"). Therefore, "[o]ur construction of the Connecticut Anti-Trust Act is aided by reference to judicial opinions interpreting the federal antitrust statutes. *Elida, Inc.* v. *Harmor Realty Corporation*, 177 Conn. 218, 226–27, 413 A.2d 1226 [1979]; *Mazzola* v. *Southern New England Telephone Co.*, 169 Conn. 344, 348, 363 A.2d 170 [1975]. Cf. *Wilson* v. *Freedom of Information Commission*, 181 Conn. 324, 435 A.2d 353 [1980]."[17] *State* v. *Hossan-Maxwell, Inc.*, 181 Conn. 655, 660, 436 A.2d 284 (1980). Accordingly, we follow federal precedent when we interpret the act unless the text of our antitrust statutes,

---

[17] We note that in 1992, the legislature explicitly incorporated into law its intent that the judiciary be guided by interpretations of federal antitrust statutes when it enacted No. 92-248 of the 1992 Public Acts, now General Statutes § 35-44b, which provides that "[i]t is the intent of the general assembly that in construing sections 35-24 to 35-46, inclusive, the courts of this state shall be guided by interpretations given by the federal courts to federal antitrust statutes."

or other pertinent state law, requires us to interpret it differently.

## II

The defendant first contends that its actions did not violate the act and that it did not engage in predatory pricing. The defendant claims that consumers benefited from the lower prices that the defendant offered and that it had no ulterior motive other than the desire to relieve traffic congestion in Westport. The defendant also contends that it did not actually compete with the plaintiff because it offered only shared ride services and not premium ride services. Furthermore, the defendant claims that the plaintiff has failed to show that the defendant engaged in predatory pricing because it had no intention of making a profit and indeed never earned a profit. We are unpersuaded.

"Monopolization requires possession and willful acquisition or maintenance of monopoly power. . . . Monopoly power is power to fix or control prices or to exclude or control competition in the relevant market." (Citations omitted.) *Shea* v. *First Federal Savings & Loan Assn. of New Haven*, 184 Conn. 285, 304, 439 A.2d 997 (1981), citing *United States* v. *Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S. Ct. 1698, 16 L. Ed. 2d 778 (1966). Similarly, a finding of attempt to monopolize requires a showing of predatory or anti-competitive conduct directed at accomplishing an unlawful purpose. *Shea* v. *First Federal Savings & Loan Assn. of New Haven*, supra, 304. Therefore, the plaintiff was required to prove two elements: (1) the defendant gained monopoly power; and (2) the defendant attained monopoly power by willfully engaging in anti-competitive business practices. See id.

## A

Accordingly, the trial court first determined that "[b]y May, 1978, [the] defendant indisputably possessed

monopoly power over taxi services in the Westport area—the 'relevant market' for antitrust purposes. After [the] plaintiff was forced to close its taxi business in May, 1978, as a result of [the] defendant's below-cost operations, [the] defendant controlled over 95 percent of the taxi market in Westport." This finding is not in dispute. As the trial court noted, monopoly power has been found where the defendant obtains from 87 to 90 percent of the market. See, e.g., *United States* v. *Grinnell Corp.*, supra, 384 U.S. 571; *United States* v. *Aluminum Co. of America*, 148 F.2d 416, 428–31 (2d Cir. 1945). Therefore, the trial court's undisputed finding that the defendant captured 95 percent of the relevant market was sufficient to support its conclusion that the defendant had obtained monopoly power.

B

The second element of monopolization requires proof that the defendant engaged in anti-competitive business practices in order to acquire or retain its monopoly power. The plaintiff based its theory of anti-competitive practices on predatory pricing and, indeed, the trial court found that the defendant had engaged in the practice of predatory pricing. "Predatory pricing may be defined as pricing below an appropriate measure of cost for the purpose of eliminating competitors in the short run and reducing competition in the long run. It is a practice that harms both competitors *and* competition. In contrast to price cutting aimed simply at increasing market share, predatory pricing has as its aim the elimination of competition." (Emphasis in original.) *Cargill, Inc.* v. *Monfort of Colorado, Inc.*, 479 U.S. 104, 117–18, 107 S. Ct. 484, 93 L. Ed. 2d 27 (1986); 3 P. Areeda & D. Turner, Antitrust Law (1978) ¶ 715b. Recent federal court cases have focused on three factors when evaluating a predatory pricing claim: (1) price cost analysis; (2) predatory intent; and (3) likelihood of recoupment.

1 A.B.A. Antitrust Section, Antitrust Law Developments (3d Ed. 1992) p. 227 (Antitrust Law Developments).

1

Predatory pricing is most commonly found when a seller sets its prices below reasonably anticipated marginal or average variable costs,[18] while prices at or above reasonably anticipated marginal or average variable costs are deemed to be nonpredatory. See *McGahee* v. *Northern Propane Gas Co.*, 858 F.2d 1487, 1503–1504 (11th Cir. 1988), cert. denied, 490 U.S. 1084, 109 S. Ct. 2110, 104 L. Ed. 2d 670 (1989) (average variable cost may usually be used as surrogate for marginal cost in determining whether pricing is predatory); *Northeastern Telephone Co.* v. *American Telephone & Telegraph Co.*, 651 F.2d 76, 88 (2d Cir. 1981), cert. denied, 455 U.S. 943, 102 S. Ct. 1438, 71 L. Ed. 2d 654 (1982) (reasonably anticipated marginal cost is best determinant for predatory pricing). The Second Circuit Court of Appeals has held that "[p]rices that are below reasonably anticipated marginal cost, and its surrogate, reasonably anticipated average variable cost . . . are *presumed predatory*." (Citations omitted; emphasis added.) *Kelco Disposal, Inc.* v. *Browning Ferris Industries of Vermont, Inc.*, 845 F.2d 404, 407 (2d Cir. 1988), aff'd on other grounds, 492 U.S. 257, 109 S. Ct. 2909, 106 L. Ed. 2d 219 (1989); see *Irvin Industries, Inc.* v. *Goodyear Aerospace Corp.*, 974 F.2d 241, 245 (2d Cir. 1992); *Northeastern Telephone Co.* v. *American Telephone & Telegraph Co.*, supra,

---

[18] Marginal cost "is traditionally defined as 'the increment to total cost that results from producing an additional increment of output.'" *Northeastern Telephone Co.* v. *American Telephone & Telegraph Co.*, 651 F.2d 76, 87 (2d Cir. 1981), cert. denied, 455 U.S. 943, 102 S. Ct. 1438, 71 L. Ed. 2d 654 (1982). "Average variable cost is the sum of all variable costs—those that vary with output—divided by output." *Morgan* v. *Ponder*, 892 F.2d 1355, 1360 n.11 (8th Cir. 1989). Variable costs are those costs that are dependent on a firm's output, while fixed costs are not. *Kelco Disposal, Inc.* v. *Browning Ferris Industries of Vermont, Inc.*, 845 F.2d 404, 407 (2d Cir. 1988), aff'd on other grounds, 492 U.S. 257, 109 S. Ct. 2909, 106 L. Ed. 2d 219 (1989).

88; see P. Areeda & D. Turner, "Predatory Pricing and Related Practices Under Section 2 of the Sherman Act," 88 Harv. L. Rev. 697, 716–18, 733 (1975).

In this case, the defendant does not contest that its fares were not only below cost but substantially below average variable costs. Indeed, as the trial court found, "[the] defendant's own analysis of its fare structure over the first two years of operation indicates [the] defendant's non-capital operating costs were $12 per operating hour per taxi as against revenues of only $6 per operating hour, literally a 50 percent below cost pricing structure."

2

Although there is substantial conflict among the federal Circuit Courts of Appeals as to whether intent is relevant to predatory pricing; 1 Antitrust Law Developments, supra, p. 234; cases have generally focused on whether a plaintiff must prove that pricing below the relevant cost standard was motivated by anti-competitive intent. Id., p. 234 n.209. The Second Circuit Court of Appeals, stating that predatory pricing requires proof that the defendant priced below "reasonably anticipated" average variable cost, has held that a trier of fact that has "evidence that [the] defendants had engaged in predatory pricing . . . could have inferred intent from this fact." *Kelco Disposal, Inc.* v. *Browning Ferris Industries of Vermont, Inc.*, supra, 845 F.2d 408. Therefore, under *Kelco Disposal, Inc.*, if the plaintiff presents proof that a defendant priced below a reasonably anticipated average variable cost, the fact finder may infer that the defendant knew that it was pricing below cost and intended to do so.

Furthermore, we have held that intent is generally proven by circumstantial evidence because direct evidence is rarely available. *State* v. *Mejia*, 233 Conn. 215, 223, 658 A.2d 571 (1995). "The test of the sufficiency

of proof by circumstantial evidence is whether rational minds could reasonably and logically draw the inference." (Internal quotation marks omitted.) *Puro* v. *Henry*, 188 Conn. 301, 310, 449 A.2d 176 (1982); *Andrea* v. *New York, N.H. & H.R. Co.*, 144 Conn. 340, 344, 131 A.2d 642 (1957).

In this case, there was ample evidence to support the trial court's conclusion that the defendant's below cost pricing was instituted to drive its competitors out of business and not merely to gain market share. Despite the defendant's contention that it did not compete with the plaintiff, the trial court determined that it did compete[19] and that due to the defendant's anti-competitive business practices the plaintiff was forced out of business. The trial court specifically found, as we previously have pointed out, that the defendant's prices were below average variable costs and that the defendant's monopolistic intent had been expressed in its application to the transportation authority. The trial court further noted that these facts were admitted by an officer

[19] The defendant contends that it did not provide premium ride service and therefore did not compete with the plaintiff in this area. The trial court determined, however, that the services that the defendant offered were substantially similar to those offered by the plaintiff. This finding is supported by the testimony of commission investigator Cumpstone. There was evidence that although shared ride service comprised most of the market for taxi services, the defendants provided premium service when it was requested. Its application to the transportation authority, which was incorporated by reference into the contract between the defendant and the federal government, stated that "[a] fully integrated taxi service will offer premium ride, shared-ride and small package delivery services within the town of Westport . . . ." Furthermore, Paul Green, one of the organizers and directors of the defendant, testified that Maxytaxy at times offered the equivalent of premium ride service. Finally, in its request for proposal for a personnel and management services contract pertaining to what became the Maxytaxy, the defendant stated that, in addition to shared ride service, it intended to provide "special market services," which was described as a demand response, advance request service. This is an apparent description of premium ride service. We conclude that there is ample evidence to support the trial court's conclusion that the defendant did compete with the plaintiff.

of the defendant and that the defendant's executive director had told the Gilberties, "[w]e are going to run this thing at below cost fares. You can't compete with us. . . . We are going to put you out of business . . . ." In addition, the trial court found that the defendant had extensive knowledge of the plaintiff's business due to the federally funded study of the plaintiff it had conducted in 1975, and that it therefore knew the plaintiff could not withstand below cost price competition.

We conclude that not only was there sufficient circumstantial evidence to support the trial court's conclusion of predatory intent, but there was also direct evidence regarding that intent.

3

The United States Supreme Court has recently held in *Brooke Group, Ltd.* v. *Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 222–24, 113 S. Ct. 2578, 125 L. Ed. 2d 168 (1993), that a plaintiff must show not only: (1) that the defendant intended to recoup its investment in below cost prices,[20] but also (2) that the defendant had a reasonable prospect of doing so in order to prove predatory pricing.[21] "For the investment to be rational,

---

[20] The trial court's found that the defendant intended to raise its prices to eliminate the government subsidy and this finding was supported by the evidence and is not clearly erroneous. Furthermore, the defendant admitted that it intended to raise its prices in order to continue to operate after the subsidy was expended.

[21] In *Brooke Group, Ltd* v. *Brown & Williamson Tobacco Corp.*, supra, 509 U.S. 209, the plaintiff alleged that the defendant had engaged in price discrimination in violation of the Clayton Act as amended by § 2 (a) of the Robinson-Patman Price Discrimination Act. 15 U.S.C. § 13 (a) (1982). The court recognized that the standard for analyzing recoupment is somewhat different under the Sherman Antitrust Act, which provides for a general prohibition against monopolistic business practices, comparable to General Statutes § 35-27. 15 U.S.C. § 2 (1982). The Sherman Antitrust Act has been interpreted to require the plaintiff to show that there was a dangerous probability that the defendant would recoup its investment in below cost pricing. *Brooke Group, Ltd* v. *Brown & Williamson Tobacco Corp.*, supra, 224. Therefore, under federal law the level of probable recoupment that the plain-

the [predator] must have a reasonable expectation of recovering, in the form of later monopoly profits, more than the losses suffered. . . . Recoupment is the ultimate object of an unlawful predatory pricing scheme; it is the means by which a predator profits from predation. Without it, predatory pricing produces lower aggregate prices in the market, and consumer welfare is enhanced. Although unsuccessful predatory pricing may encourage some inefficient substitution toward the product being sold at less than its cost, unsuccessful predation is in general a boon to consumers." (Citation omitted; internal quotation marks omitted.) Id., 224. "Determining whether recoupment of predatory losses is likely requires an estimate of the cost of the alleged predation and a close analysis of both the scheme alleged by the plaintiff and the structure and conditions of the relevant market." Id., 226.

In this regard, the defendant claims that it never intended to generate profits and that the price increases that were implemented after the plaintiff had gone out of business did not recoup the defendant's losses. The defendant further claims that it never intended to recoup its losses, which were covered by the government subsidies, that its ridership dropped after its rates increased, and that it subsequently was forced to cease operations.

Because the case before us presents a novel circumstance,[22] we do not employ literally the second prong of *Brooke Group, Ltd.*—that is, the requirement of a

tiff must show varies according to which act the plaintiff alleges that the defendant violated. Because, in this case, we conclude that the defendant had no investment or losses to recoup, we leave for another day the issue of the level of probability of recoupment that must be shown in order to prove predatory pricing under the Connecticut act.

[22] The parties have been unable to point to any analogous case involving a similar instance of an alleged predatory pricing scheme that was federally funded either in Connecticut or elsewhere. In addition, our research has not revealed such a case.

reasonable prospect of recoupment. Although there may have been little prospect of recouping the federal grants that the government had provided to the defendant, federal funding enabled the defendant to charge below cost prices at no risk to itself. As a result of its below cost pricing, the defendant was able to drive all its competitors out of the market at the expense of the federal government.[23] After the plaintiff was forced out of business, which was well before the defendant expended its government subsidy, the trial court determined that the defendant substantially raised its prices, by 28 percent. It continued to raise its fares after the initial increase. In reality, the defendant suffered no losses from pricing below cost. Moreover, as the trial court specifically found, once its competition had been eliminated, the defendant intended to raise rates so that it would no longer depend upon the government subsidies. Accordingly, in considering whether the second prong was satisfied, the trial court could have taken into account the government subsidy together with the increases in pricing once the plaintiff closed its doors. Therefore, there was sufficient evidence to support the trial court's conclusion that the defendant's pricing was predatory and that the defendant was liable under the act.

III

The defendant claims that the trial court improperly concluded that the defendant is not entitled to either absolute governmental immunity or qualified immunity pursuant to General Statutes § 35-31 (b).[24] The plaintiff

---

[23] Maxytaxy's only competition after May, 1978, was from Teddy's Taxi which, under new ownership, reinitiated its limousine services in the fall of 1978. The town of Westport conditioned the lease for livery service at the train station on a requirement that Teddy's Taxi provide limited taxi service. As a result, that taxi service, which operated at a substantial loss, totaled two taxis and averaged ten rides per day within Westport.

[24] General Statutes § 35-31 (b) provides: "Nothing contained in this chapter shall apply to those activities of any person when said activity is specifically directed or required by a statute of this state, or of the United States."

argues that because the defendant failed to plead immunity as a special defense, or to raise the defense at trial, the issue of whether the defendant is entitled to governmental immunity is not reviewable by this court.

We have previously determined that governmental immunity must be raised as a special defense in the defendant's pleadings. *Gauvin* v. *New Haven*, 187 Conn. 180, 184–85, 445 A.2d 1 (1982). "Governmental immunity is essentially a defense of confession and avoidance similar to other defenses required to be affirmatively pleaded [under Practice Book § 164]. . . . The purpose of requiring affirmative pleading is to apprise the court and the opposing party of the issues to be tried and to prevent concealment of the issues until the trial is underway." (Citations omitted.) Id., 185.[25] In this case, the defendant did not specially plead any immunity defense—absolute or qualified.

In certain limited circumstances, an appellate court will address the issue of whether governmental immunity is available to a defendant where the defense was not specially pleaded. If the question of governmental immunity was fully litigated at trial, without objection

---

[25] We note that in *Gauvin*, although governmental immunity was not specially pleaded and the trial court therefore refused to consider it for that reason, this court remanded the case for articulation regarding whether the defendant was entitled to governmental immunity because the trial court had requested certain clarifications from the parties after the trial wherein the defendant raised the defense. We concluded that, because the trial court specifically requested the information through which the defense was introduced, the court created the opportunity for the defense to be raised and, therefore, we held that the court had no discretion regarding whether to consider the defense. *Gauvin* v. *New Haven*, supra, 187 Conn. 185–86. More importantly, however, this court based its decision on the determination that there was apparently "an adequate basis for the trial court to determine whether . . . the defense of governmental immunity could have been sustained." Id., 187. In the case before us, the issue was introduced in the normal coarse of filing posttrial memoranda of law, and there was no evidence introduced by the defendant upon which the court could make a determination on the merits.

from the plaintiff, the plaintiff is deemed to have waived its objection to the requirement that the defense be specially pleaded. Id., 184. In this case, the defendant did not raise the issue of governmental immunity at trial and the plaintiff cannot be deemed to have waived its objection. In fact, the issue was first raised by the plaintiff in its posttrial brief in which it urged that the defendant was not entitled to immunity. In its reply brief, the defendant addressed the issue of immunity for the first time.

The defendant argues that we should invoke plain error review to decide the issue of qualified immunity pursuant to § 35-31 (b). Under Practice Book § 4185, although we are not bound to review the defendant's claim, we "may in the interests of justice notice plain error not brought to the attention of the trial court." See *Magnan* v. *Anaconda Industries, Inc.*, 193 Conn. 558, 577–78, 479 A.2d 781 (1984). Plain error review "is reserved for truly extraordinary situations where the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings." (Internal quotation marks omitted.) *Scott* v. *Barrett*, 212 Conn. 217, 222, 561 A.2d 941 (1989).

In order to be shielded by qualified state action immunity, the defendant must show that its anti-competitive conduct was "specifically directed or required" by the government; General Statutes § 35-31 (b); *Mazzola* v. *Southern New England Telephone Co.*, supra, 169 Conn. 359, 366 (interpreting act to apply more stringent standards for exemption from liability than federal law because "[§] 35-31 (b) of our General Statutes has no parallel in the federal antitrust statutes," and holding that governmental role amounting to mere acquiescence cannot be construed as directing or requiring an action under the state statute). We conclude that plain error review is not warranted with respect to the issue

of qualified immunity in this case because the record is factually insufficient to permit such a review. Whether the monopolistic conduct of the defendant was "specifically directed or required" by the government is a mixed question of fact and law; see *Schnabel* v. *Tyler*, 230 Conn. 735, 743, 646 A.2d 152 (1994) (question of immunity predicated on factual issues as well as law); and the record before us is insufficient to make such a determination. See *Genovese* v. *Gallo Wine Merchants, Inc.*, 226 Conn. 475, 480 n.6, 628 A.2d 946 (1993).

The defendant also claims that it is shielded from liability by the governmental immunity applicable to municipalities and their agencies because it is a transit district established by the town of Westport.[26] Unlike the state, municipalities "have no sovereign immunity from suit." *Cone* v. *Waterford*, 158 Conn. 276, 278, 259 A.2d 615 (1969). Rather, municipal governments have a limited immunity from liability. *Tango* v. *New Haven*, 173 Conn. 203, 204–205, 377 A.2d 284 (1977). Nevertheless, regardless of whether a defendant is an agency of the state claiming the protection of sovereign immunity or an agency of the town claiming a limited immunity, the issue of whether it is entitled to such immunity is fact bound. See *Gauvin* v. *New Haven*, supra, 187 Conn. 186 (whether town is entitled to limited governmental immunity is question of fact); *Dolnack* v. *Metro-North Commuter Railroad Co.*, 33 Conn. App. 832, 836–37,

---

[26] The defendant also argues that because the federal antitrust laws exempt local government from liability, it should also be protected under the Connecticut act. In 1984, long after the actions at issue in this case took place, the Local Government Antitrust Act was enacted, which exempts local government entities from federal antitrust damage awards. 15 U.S.C. §§ 34–36 (1989). Prior to the amendment, however, municipalities were liable under federal law for treble antitrust damages. See *Palm Springs Medical Clinic, Inc.* v. *Desert Hospital*, 628 F. Sup. 454, 459–60 n.4 (C.D. Cal. 1986). In Connecticut, municipalities have not been exempted by statute from antitrust damages. Accordingly, we reject the defendant's argument that its actions during 1977 and 1978 should be exempt from antitrust liability.

639 A.2d 530 (1994) (listing several fact based factors that must be considered in determining whether given entity is entitled to immunity of state); see also 5 F. Harper, F. James & O. Grey, Torts (2d Ed. 1986) § 29.6, p. 627 (in considering whether immunity applies based on government-proprietary distinction, criteria most commonly considered are: [1] whether function is allocated to municipality for its profit or special advantage; and [2] whether function is one historically performed by government). Because this issue was raised only in the posttrial briefs of the parties, the record is insufficient to determine whether the defendant is a municipal agent and, if so, whether it may be shielded by governmental immunity from antitrust liability.[27] Accordingly, we also decline to review whether the defendant is entitled to the limited governmental immunity available to municipalities and their agencies.

## IV

We next turn to the defendant's allegation that the trial court improperly awarded the plaintiff damages based on speculative data and that, therefore, the plaintiff failed to establish damages with reasonable certainty.

The trial court has broad discretion in determining damages. *Buckman* v. *People Express, Inc.*, 205 Conn.

---

[27] Although the trial court discussed governmental immunity in its memorandum of decision, and held that the defendant was not entitled to it, the court reached this conclusion by determining that governmental immunity is not available to transit districts pursuant to General Statutes § 7-273h. Section 7-273h (a) provides in relevant part: "Any district operating a transit service pursuant to the provisions of this chapter shall be responsible for any injury or damage to persons or property, happening or arising by reason of the maintenance or operation of the same, in the same manner and to the same extent as though the same were owned and operated by individuals or by a private corporation. . . ." Because we are unable to determine in the first instance whether the defendant would have otherwise been entitled to governmental immunity, we leave for another day the question of whether § 7-273h constitutes a waiver of immunity from liability under the Connecticut act.

166, 175, 530 A.2d 596 (1987); *Amwax Corp.* v. *Chadwick*, 28 Conn. App. 739, 745, 612 A.2d 127 (1992). The determination of damages involves a question of fact that will not be overturned unless it is clearly erroneous. *Beckman* v. *Jalich Homes, Inc.*, 190 Conn. 299, 309–10, 460 A.2d 488 (1983); *Gerber & Hurley, Inc.* v. *CCC Corp.*, 36 Conn. App. 539, 545, 651 A.2d 1302 (1995). " '[T]he vagaries of the marketplace usually deny us sure knowledge of what [the] plaintiff's situation would have been in the absence of the defendant's antitrust violation.' This fact and the general belief that it would be inequitable to allow a wrongdoer to defeat recovery by insisting on rigorous proof of damages have resulted in a lesser burden of proving the amount of damages in antitrust suits than in other contexts." 1 Antitrust Law Developments, supra, p. 668. "A damage theory may be based on assumptions so long as the assumptions are reasonable in light of the record evidence." Id., p. 673; see, e.g., *National Farmers' Organization, Inc.* v. *Associated Milk Producers, Inc.*, 850 F.2d 1286, 1301–1303 (8th Cir. 1988), cert. denied, 489 U.S. 1081, 109 S. Ct. 1535, 103 L. Ed. 2d 840 (1989). The reasonableness of the assumptions underlying the plaintiff's damage theory is determined by the trier of fact. *General Leaseways, Inc.* v. *National Truck Leasing Assn.*, 830 F.2d 716, 726–27 (7th Cir. 1987). Federal appellate courts have refused to find damage evidence insufficient unless there was no basis for critical assumptions made by the trial court. See *McGlinchy* v. *Shell Chemical Co.*, 845 F.2d 802, 806–807 (9th Cir. 1988).

The defendant challenges the trial court's findings that the plaintiff is entitled to damages for lost profits for the year ending May, 1978, in the amount of $12,144, and for the loss of the business, which the court valued at $150,000.

### A

It is well established that lost profits may be awarded as damages for antitrust violations. See, e.g., *H.J., Inc.*

v. *International Telephone & Telegraph Corp.*, 867 F.2d 1531, 1549 (8th Cir. 1989); *D&S Redi-Mix* v. *Sierra Redi-Mix & Contracting Co.*, 692 F.2d 1245, 1249 (9th Cir. 1982). In this case, the trial court made meticulous findings of fact and clearly detailed its calculations regarding the plaintiff's damages for the year in which the defendant directly competed with the plaintiff.

The defendant points to the fact that although the plaintiff's rates were controlled by the commission, the plaintiff did not choose to seek a rate increase from 1970, until it ceased business in 1978. The defendant claims that, therefore, the trial court's finding that if the defendant had not competed at below cost rates the plaintiff would have requested and received authorization to increase its rates from the commission was purely speculative.[28] We disagree.

First, we must view the defendant's claim in its proper context. The trial court found that the plaintiff had been unable to request an increase in its rates from 1976, onward, initially because of the advent of the Minnybus

---

[28] The defendant contends that the trial court incorrectly calculated the plaintiff's damages based on the rates for premium ride service in the surrounding localities because the defendant did not compete with the plaintiff in this area. There was contradictory testimony on this point. See footnote 19. The trial court concluded that the defendant and the plaintiff provided substantially the same services and this conclusion is supported by the testimony presented at trial.

A related argument that the defendant sets forth is that the trial court improperly applied the premium ride service rate of $2.70 to calculate the plaintiff's damages. There was a wide range of rates that applied according to the distance traveled. The trial court determined that $2.70 was the rate charged for the average distance traveled. There was no evidence offered to show that shared ride service resulted in lower per ride revenues to the taxi companies than premium ride service. On the contrary, although the record is unclear regarding how shared rider service was charged, it was reasonable for the trial court to assume that although individual shared ride passengers paid less than they would have for premium service, the total revenue to the taxi company was at least the same as premium service. Therefore, we conclude that the use by the trial court of an average distance and rate was reasonable.

service and subsequently because the Gilberties knew that the defendant intended to compete with them directly at rates set below cost. The plaintiff sought damages, however, exclusively for the one year period in which it competed directly with the defendant's Maxytaxy. The trial court specifically found that the "[p]laintiff legitimately feared that it would have trouble enough competing with Maxytaxy's service at present rates, without adding to the problem by increasing its fares." The defendant does not challenge these findings.

The trial court found that when the commission reviews an application for an increase in rates, it considers the rates charged in comparable localities and the profitability to the taxi operator. The commission considers a reasonable rate of return to be a ratio of operating costs to gross revenue of between 85 and 95 percent, or, in other words, a return of between five cents and fifteen cents on every dollar. In 1977, the plaintiff was permitted to charge only $1.80 for a one-way three mile trip, which the trial court found was the plaintiff's average fare, while taxi companies in the surrounding areas of Bridgeport, Greenwich and Stamford were permitted to charge $2.70 for the same distance.

The trial court further determined that, if the plaintiff had increased its average fare to $2.70, it would have had a net operating ratio of 87 percent, which was within the commissioner's guidelines for a fair rate of return. Accordingly, the trial court found that during the year in which the plaintiff was competing with the Maxytaxy, the plaintiff could have obtained permission to charge $2.70 for a one-way three mile trip instead of $1.80 because the surrounding communities were charging that rate. The trial court concluded that if the defendant had not competed illegally, the plaintiff would have sought permission to charge an average $2.70 fare and that such an increase would have been

granted.[29] Therefore, the trial court based its award of the damages for lost profits on the difference between the $1.80 average fare the plaintiff collected during the year ending May, 1978, and the $2.70 average fare it could have earned.

The trial court found, on the basis of the plaintiff's financial information, that the plaintiff earned a net profit of $5759.12[30] during the year it competed directly with the defendant.[31] The trial court then determined that if Maxytaxy had not illegally competed with the plaintiff and if the plaintiff had requested and received rate increases comparable to those charged in the surrounding communities, based on its actual 1977 ridership,[32] the plaintiff would have earned an adjusted

[29] In addition, John Riley, a senior rate specialist with the commission who was responsible for the development and approval of taxi rates, testified that if the plaintiff had requested a fare increase in 1977, the commission would have approved such an increase to the rate of $2.70 for a three mile trip that was charged in other nearby localities.

[30] The defendant argues that, because the plaintiff generated greater revenues in 1977, after the defendant initiated the Maxytaxy, than in 1974, before the defendant began its operations, the plaintiff, therefore, was not negatively impacted by the Maxytaxy. This argument is without merit. It is true that the plaintiff's revenues from taxi operations were $114,070 in 1977, as opposed to $100,362 in 1974. We have already affirmed the trial court's determination, however, that if the defendant had not competed illegally at below cost prices in order to drive the plaintiff out of business, the plaintiff's revenue would have been much higher This is the dispositive issue that entitles the plaintiff to lost profits.

[31] In addition to revenues from its taxi operations, the plaintiff also earned revenue from a rental car business, vending machines and the sale of lottery tickets. The trial court subtracted all revenue that was not directly derived from the plaintiff's taxi services from its damage calculations. The defendant does not dispute the trial court's calculations or conclusion regarding the plaintiff's actual profits for this period.

[32] The defendant argues that the trial court improperly based its calculations on the assumption that the defendant did not exist at all and awarded damages according to what the plaintiff would have earned without any competition from the defendant.

It is impossible to speculate regarding what would have happened if the defendant had chosen to compete legally. It certainly would have had to charge fares sufficient to perpetuate its existence. What those fares would

operating profit of $17,903.[33] Accordingly, the trial court concluded that the plaintiff had suffered lost profits between April, 1977, and May, 1978, of the difference between $17,903 and $5759, which totals $12,144.[34]

We conclude that the trial court based its calculation of the plaintiff's damages due to lost profits on sufficient evidence and reasonable assumptions, and, accordingly, the trial court's calculation of the plaintiff's damages from lost profits was not clearly erroneous.[35]

B

The defendant also claims that the trial court improperly awarded the plaintiff damages of $150,000 for the loss of the business. "Where the plaintiff's business is totally or partially destroyed by [the] defendant's

have been is not determinable and, therefore, as the trial court stated, the level of competition the defendant would have given the plaintiff is similarly indeterminate.

Contrary to the defendant's allegation, however, the trial court did not assume the defendant's nonexistence when it calculated the plaintiff's damages. The trial court used the plaintiff's actual ridership during the period between 1977 and 1978, which had been adversely impacted by competition from the defendant and was lower than it otherwise would have been. Michael Gilbertie testified that the plaintiff's ridership dropped noticeably in 1977. In contrast, the defendant's ridership increased from 1458 in April, 1977, to 11,319 in January, 1978. It is reasonable to assume that a substantial portion of the plaintiff's lost ridership was the defendant's gain. Therefore, a competitive impact was included in the calculation.

[33] The trial court further determined that this outcome was reasonable because it was within the range that the commission deemed an acceptable profit margin. The plaintiff's adjusted revenue for 1977 would have been $176,587, which amounts to a net operating ratio of 87 percent.

[34] The defendant has not challenged on appeal any aspect of the mathematic methodology employed by the trial court and, therefore, we do not review it.

[35] The defendant argues that any decrease in revenues between 1976 and 1977 was due to the closing of the plaintiff's evening operations, which was, in turn, due to the death of John Gilbertie, who worked as the night dispatcher. Michael Gilbertie testified, however, that the decision was precipitated by the fact that, due to competition from the defendant, the evening operations were not profitable and that was the basis of the decision to discontinue them. The trial court obviously decided to credit his testimony and the defendant has failed to show that the court's decision was clearly erroneous.

violation . . . damages may be measured by lost good-will or the 'going concern' value of [the] plaintiff's business." 1 Antitrust Law Developments, supra, p. 670; *Sciambra* v. *Graham News Co.*, 841 F.2d 651, 657 (5th Cir.), cert. denied sub nom. *Sciambra* v. *ARA Services, Inc.*, 488 U.S. 855, 109 S. Ct. 143, 102 L. Ed. 2d 115 (1988). A plaintiff injured by an antitrust violation may recover both lost past profits and the probable value of the business. *Northeastern Telephone Co.* v. *American Telephone & Telegraph Co.*, supra, 651 F.2d 95 n.30.

After calculating the plaintiff's lost profits, the trial court determined what the plaintiff's value would have been if the defendant had not forced it out of business due to its illegal, anti-competitive business practices. The court found that an appropriate return on investment for the period of 1976 through 1978 would have been approximately 10 to 12 percent. By capitalizing the plaintiff's projected profits for the year ending May, 1978, the trial court concluded that the value of the plaintiff's business was $150,000.[36]

The defendant first argues that its operations had nothing to do with the plaintiff's decision to cease operations and that the trial court improperly awarded the plaintiff damages for the value of the business. The defendant claims that the plaintiff closed because the severe winter necessitated the purchase of new vehicles and the Gilberties were unwilling personally to secure business loans that would have been required to acquire the new vehicles. Michael Gilbertie testified, however, that the underlying reason for their decision not to purchase new vehicles was that they felt that, because of competition from the defendant, such an investment

---

[36] The trial court capitalized $17,903 at between 10 to 12 percent, and valued the plaintiff's taxi franchise at between approximately $149,000 and $179,000.

would not have been prudent.[37] The trial court credited Gilbertie's testimony and the defendant has failed to show that the decision was clearly erroneous.

The defendant next claims that the trial court improperly credited Michael Gilbertie's suggested valuation of the business. Although the defendant concedes that Gilbertie was entitled to testify as to the company's value, it claims that Gilbertie's testimony concerned the proper method to value a taxi company and that it should not have been credited because such an opinion could only have been given by a qualified expert. The defendant argues, therefore, that the trial court improperly permitted Gilbertie to give expert testimony without being qualified or disclosed as an expert. We are not persuaded by the defendant's distinction between Gilbertie's valuation of the business and his method of valuation.

Gilbertie testified that, because a fair return on a taxi business would be 10 percent to 12 percent, he valued the business at between $194,875 and $233,850. The trial court determined that Gilbertie's valuation of the business was "based on his own experience in the taxi business for more than twenty years, his knowledge of how a taxi business was valued by the industry, his discussions with other owners, his knowledge of other sales, his membership in the Connecticut Taxi Cab Association, his membership in the International Taxi Cab Association, and finally, his own personal experience and practice in the 1960s and 1970s . . . ." The trial court applied this rate of return to its own calculations of the plaintiff's lost profits and concluded that the plaintiff's value was $150,000.

[37] Michael Gilbertie explained: "[W]e just saw no way from a business point of view that we should risk our private property to continue beating our head against the wall and competing with these people. And like my father said, don't throw good money after bad. And we were in a no win situation. So we just said, close the doors . . . ."

It is well settled that the owner of property is competent to testify to its value. *Somers* v. *LeVasseur*, 230 Conn. 560, 566 n.2, 645 A.2d 993 (1994); *Griffin* v. *Nationwide Moving & Storage Co.*, 187 Conn. 405, 422, 446 A.2d 799 (1982); *Anderson* v. *Zweigbaum*, 150 Conn. 478, 483 n.1, 191 A.2d 133 (1963); *State* v. *Rochette*, 25 Conn. App. 298, 307, 594 A.2d 1006, cert. denied, 220 Conn. 912, 597 A.2d 337 (1991), cert. denied, 502 U.S. 1045, 112 S. Ct. 905, 116 L. Ed. 2d 806 (1992). Furthermore, we have determined that a franchise owner is competent to testify as to the value of a franchise. *Lovejoy* v. *Darien*, 131 Conn. 533, 536, 41 A.2d 98 (1945). This is "based in part on the common experience that an owner is familiar with her property . . . ." (Internal quotation marks omitted.) *Somers* v. *LeVasseur*, supra, 566 n.2. "The weight to be accorded such testimony is for the trier to decide." *Ridgeway* v. *Ridgeway*, 180 Conn. 533, 544 n.7, 429 A.2d 801 (1980).

We note that the trial court has broad discretion to admit the testimony of anyone who is involved with a business or property and may have personal knowledge of its value. *Lovejoy* v. *Darien*, supra, 131 Conn. 536. We conclude that as an owner, Gilbertie was competent to testify as to the method he employed in valuing his business, and that the weight given such testimony was for the trial court to decide.

Gilbertie testified as to what he thought his business would have been worth according to the return that he expected on his investment if the defendant had not illegally competed with the plaintiff. The defendant did not object to the substance of this testimony and, as the trial court noted, there was no motion to strike Gilbertie's testimony for lack of foundation or competence. The trial court determined that the asserted rate was reasonable and the defendant has provided no basis for overturning the trial court's determination. The court did not characterize Gilbertie's testimony as

expert, nor do we. The testimony was that of a business owner testifying as to the value of his business and the method he employed to value it. Its admission was a matter within the discretion of the trial court.[38]

## V

Finally, we turn to the defendant's claim that the trial court improperly awarded prejudgment interest to the plaintiff.[39]

[38] The defendant further claims that the plaintiff did not suffer a total loss when it chose to discontinue operations and that the trial court did not properly credit the defendant for several transactions and retained assets. First, the defendant contends that the plaintiff's Weston operation and package delivery service should have been deducted from the damages awarded. We do not agree. The defendant's illegal conduct caused the plaintiff to lose its entire business, not only the parts in which the plaintiff and the defendant directly competed. The defendant offered no evidence that the plaintiff could have continued to run a profitable enterprise by operating one taxi in Weston and delivering packages.

The defendant next contends that the plaintiff's certificate of public necessity and convenience had value and should have been deducted from its damages. Although the defendant did not raise this issue at trial and the trial court did not make any findings regarding the certificate, it reasonably could have found that the certificate was worthless at the time the plaintiff ceased operations. The below cost fares offered by the defendant would have been a serious disincentive for any private taxi operator to begin operations in Westport, and it is doubtful that any such operator would have attempted to enter the Westport market.

Finally, the defendant claims that the plaintiff retained two cars and its dispatching equipment and that the value of this equipment should have been discounted from the damage calculation. We disagree. The plaintiff unsuccessfully attempted to sell its dispatching equipment and sold two fully depreciated taxis for between $200 and $300. Accordingly, the dispatching equipment had no value and the value of the cars was negligible. We conclude that none of the defendant's contentions shows that the trial court's damage determination was clearly erroneous.

[39] In addition to arguing that the act includes no provision for prejudgment interest, the defendant alleges that the plaintiff is not entitled to prejudgment interest because it did not seek prejudgment interest in its amended complaint. It is well established that interest need not be specially claimed in the demand for damages in order to recover. Practice Book § 140. " 'The allowance of interest as an element of damages is . . . primarily an equitable determination and a matter lying within the discretion of the trial court.' "

## A

The plaintiff contends that because the defendant failed to object in the trial court to the plaintiff's claim that it was entitled to prejudgment interest, and raises its various objections to the award for the first time on appeal, we should not reach this issue. The plaintiff clearly argued that it was entitled to prejudgment interest in its proposed posttrial findings of fact and conclusions of law, and in its posttrial memorandum of law. The defendant had an opportunity to respond to the plaintiff's claim in its reply brief but failed to argue that prejudgment interest was not an appropriate remedy. Thus, because the defendant makes this argument for the first time on appeal, the trial court was never alerted to the claim that, as a matter of law, the plaintiff is not entitled to prejudgment interest.[40] Nevertheless, we reach this issue under the plain error rule for several reasons.[41]

First, because we conclude that the statutory scheme of the act does not permit an award of interest, it was plain error for the trial court to rely on an improper statute to provide for such an award even though this was not brought to the attention of the court during trial. See *Genovese* v. *Gallo Wine Merchants, Inc.*, supra, 226 Conn. 480 n.6. Second, neither party is prejudiced by our decision to review this issue under the plain error rule. Id. Unlike the issues of immunity and treble

---

*State* v. *Stengel*, 192 Conn. 484, 487, 472 A.2d 350 (1984). We conclude that the plaintiff's claim for prejudgment interest was properly before the trial court.

[40] Practice Book § 285A requires that "[i]f a party intends to raise any claim of law which may be the subject of an appeal, he must either state the same distinctly to the court before his argument is closed or state it in a written trial brief. If this is not done, it will not be the duty of either the trial court or the appellate court to decide the claim."

[41] Reference is made to our discussion of plain error review in part III of this opinion.

damages[42] in this case, our interpretation of the statutes does not require further fact-finding by the trial court, and both parties have had an opportunity to present arguments regarding their proposed statutory interpretation in their appellate briefs. Plain error review may be appropriate where the record is complete and the question is essentially one of law, so that neither party is prejudiced. Id.

Finally, we note that a substantial amount of the total damages awarded by the trial court consists of prejudgment interest. This is largely because the case has lingered in our court system since 1979, when the plaintiff filed its initial complaint. It lay virtually dormant from 1979 to 1989, when the plaintiff amended its complaint. During that interval, the case was subject to the dormancy program; Practice Book § 251; which requires dismissal if the plaintiff fails to prosecute with reasonable diligence. Indeed, the case was dismissed at least once, in 1981, but was restored to the docket pursuant to motions by the plaintiff. As a result of this leisurely progression, the case was not heard by the trial court until 1991, twelve years after it had been commenced. The trial court awarded prejudgment interest in the amount of $187,276 for that entire length of time and then trebled the award, the total of which amounted to $561,828.

Although the plaintiff submitted one motion for default in 1989, and the defendant filed one motion for an extension of time, most of the delay was apparently due to the plaintiff's failure to pursue the action. Surely, it would be unjust to compensate the plaintiff for its own procrastination. We conclude that the interests of justice demand that we review the trial court's award of prejudgment interest. *Magnan* v. *Anaconda Industries, Inc.*, supra, 193 Conn. 577–78 (plain error review appropriate where interests of justice require it).

---

[42] See footnote 16.

## B

In this case, for the first time, we are asked to decide whether a plaintiff may be awarded prejudgment interest under the act.

Our analysis is guided by the well established rules of statutory interpretation, the intent of the legislature and interpretations of federal law upon which the act is structured. Section 35-35 mandates an award of treble damages, attorney's fees and costs for injury to business or property due to any violation of the provisions of the act. The plaintiff argues that, although the act includes no explicit provision for prejudgment interest, it is entitled to such an award pursuant to General Statutes § 35-44, which provides that "[u]nless otherwise set forth in this chapter, all actions or proceedings under the provisions of this chapter shall be according to the statutes of Connecticut pertaining to civil actions." See General Statutes § 37-3a.[43] Therefore, the plaintiff claims that the trial court had discretion to award prejudgment interest. We disagree.

We begin our analysis with the principles of statutory interpretation. First, we look to the words of the statute in order to discern the intent of the legislature and then resolve any ambiguity by turning for guidance to the

---

[43] General Statutes § 37-3a provides: "Rate recoverable as damages. Except as provided in sections 37-3b, 37-3c and 52-192a, interest at the rate of ten per cent a year, and no more, may be recovered and allowed in civil actions or arbitration proceedings under chapter 909, including actions to recover money loaned at a greater rate, as damages for the detention of money after it becomes payable. Judgment may be given for the recovery of taxes assessed and paid upon the loan, and the insurance upon the estate mortgaged to secure the loan, whenever the borrower has agreed in writing to pay such taxes or insurance or both. Whenever the maker of any contract is a resident of another state or the mortgage security is located in another state, any obligee or holder of such contract, residing in this state, may lawfully recover any agreed rate of interest or damages on such contract until it is fully performed, not exceeding the legal rate of interest in the state where such contract purports to have been made or such mortgage security is located."

legislative history and purpose. *In re Sheldon G.*, 216 Conn. 563, 568–69, 583 A.2d 112 (1990). In this case, the plain meaning of the statutes, in conjunction with the principle that no statutory phrase or word will be interpreted as superfluous; *Rydingsword* v. *Liberty Mutual Ins. Co.*, 224 Conn. 8, 16, 615 A.2d 1032 (1992); leads us to conclude that the legislature intended to include in § 35-35 all the elements of damage available to an injured plaintiff in an antitrust action.

Section 35-35 specifically provides that a successful plaintiff shall recover its costs. Similarly, chapter 901 of the General Statutes provides for the recovery of costs by a successful plaintiff in a civil action. If the legislature had intended § 35-44 to incorporate all civil remedies into the antitrust act, it would not have had to specify that costs were recoverable because chapter 901 would have been incorporated into the antitrust act through § 35-44. A statute must be interpreted to give effect to all its provisions. *Pintavalle* v. *Valkanos*, 216 Conn. 412, 418, 581 A.2d 1050 (1990). No word within a statute is to be rendered mere surplusage. *Rydingsword* v. *Liberty Mutual Ins. Co.*, supra, 224 Conn. 16. Therefore, we cannot interpret § 35-44 to incorporate all civil remedies because such an interpretation would render the inclusion of costs superfluous in § 35-35. Furthermore, "[u]nless there is evidence to the contrary, statutory itemization indicates that the legislature intended the list to be exclusive." (Internal quotation marks omitted.) *White Oak Corp.* v. *Dept. of Transportation*, 217 Conn. 281, 301, 585 A.2d 1199 (1991). We conclude that the Connecticut legislature intended specifically to include all available remedies for an antitrust violation in § 35-35 and that because prejudgment interest is not specifically included, it may not be awarded.

We note that this statutory interpretation is consistent with our law that prohibits awards of interest on

punitive damages.[44] *Nielsen* v. *Wisniewski,* 32 Conn. App. 133, 140, 628 A.2d 25 (1993). In *Nielsen,* the court reasoned that "[t]he purpose of an award of interest is to compensate a party for a wrong. . . . Such an allowance is primarily an equitable determination within the discretion of the trial court. . . . Under General Statutes § 37-3a, interest 'may be recovered and allowed in civil actions . . . as damages for the detention of money after it becomes payable.' For example, interest is awarded at the maturity of a debt from the time the money becomes due. . . . Since punitive damages do not become payable before judgment, however, § 37-3a is inapplicable." (Citations omitted.) Id., 139. We believe this reasoning is equally pertinent in the case before us.

Our conclusion that prejudgment interest is not available under the Connecticut antitrust act is supported by judicial interpretations of the federal antitrust statutes.[45] Until 1980, the federal antitrust statutes did not provide for prejudgment interest and federal courts universally refused to award it.[46] "Although federal courts

[44] Treble damages are punitive damages. *Avis Rent A Car System, Inc* v. *Liberty Mutual Ins. Co* , 203 Conn. 667, 671, 526 A.2d 522 (1987); 3 P. Areeda & D. Turner, supra, ¶ 630c.

[45] We note that the federal statutes include no equivalent to § 35-44 and that there is no discussion of this provision in the legislative history of the act. Therefore, we cannot ascertain the precise legislative intent for its enactment. Title 15 of the United States Code, § 21, details, however, how federal antitrust actions must be handled procedurally. Section 21 discusses at length, for example, the issuance of complaints for violations, hearing procedures, review of orders, jurisdiction, conclusiveness of findings, finality of judgment and service of process. No such procedural detail is included in the Connecticut antitrust act and it is reasonable to assume that the legislature included § 35-44 to indicate that state antitrust actions are to be managed procedurally in the same manner as any other civil action unless otherwise stated in the act.

[46] Our research has revealed only two cases in which prejudgment interest had been awarded in an antitrust action. *Uniroyal, Inc.* v. *Jetco Auto Service, Inc.,* 1980–81 Trade Cas. CCH ¶ 63,806, pp. 78,315, 78,321 (S.D.N.Y. 1981); *Eiberger* v. *Sony Corp. of America,* 459 F. Sup. 1276, 1289 (S.D.N.Y. 1978), rev'd on other grounds, 622 F.2d 1068 (2d Cir. 1980). This precedent was effectively overruled in *Strobl* v. *New York Mercantile Exchange,* 768 F.2d

generally have the discretion to award pre-judgment interest, it [was] widely believed that such discretion does not exist in antitrust cases since trebling provides adequate compensation for delay." A. Josyln, "Measures of Damages for the Destruction of a Business," 48 Brook. L. Rev. 431, 462 (1982). Because the statutes mandate an award of treble antitrust damages, courts have reasoned that any such award is intended to be substantial enough to include all that the plaintiff is entitled to receive. See, e.g., *Strobl* v. *New York Mercantile Exchange*, 768 F.2d 22, 24 (2d Cir. 1985) (summarily affirming reasoning in *Strobl* v. *New York Mercantile Exchange*, 590 F. Sup. 875, 882–83 [S.D.N.Y. 1984]; *Trans World Airlines, Inc.* v. *Hughes*, 449 F.2d 51, 80 (2d Cir. 1971), rev'd on other grounds, 409 U.S. 363, 93 S. Ct. 647, 34 L. Ed. 2d 577 (1973); *Locklin* v. *Day-Glo Color Corp.*, 429 F.2d 873, 877 (7th Cir. 1970), cert. denied, 400 U.S. 1020, 91 S. Ct. 582, 584, 27 L. Ed. 2d 632; *Smith* v. *Pro-Football, Inc.*, 528 F. Sup. 1266, 1275 (D.D.C. 1981); *Cape Cod Food Products, Inc.* v. *National Cranberry Assn.*, 119 F. Sup. 900, 911 (D. Mass. 1954).

In 1980, the federal antitrust statutes were amended to permit the recovery of prejudgment interest on actual damages in specific and limited circumstances. 15 U.S.C. §§ 15 (a) and 15a (1982), as amended, Act of Sept. 12, 1980, Pub. L. No. 96-349, 94 Stat. 1156.[47] Federal

22 (2d Cir.), cert. denied sub nom. *Simplot* v. *Strobl*, 474 U.S. 1006, 106 S. Ct. 527, 88 L. Ed. 2d 459 (1985), which affirmed the lower court's adoption of the reasoning in *Trans World Airlines, Inc.* v. *Hughes*, 449 F.2d 51, 80 (2d Cir. 1971), rev'd on other grounds, 409 U.S. 363, 93 S. Ct. 647, 34 L. Ed. 2d 577 (1973), that mandatory treble damages are sufficient to compensate a plaintiff in an antitrust action. See *Strobl* v. *New York Mercantile Exchange*, 590 F. Sup. 875, 882–83 (S.D.N.Y. 1984) (providing detailed discussion of why prejudgment interest is unavailable where damages are trebled).

[47] Title 15 of the United States Code, § 15 (a) (1982) provides in relevant part: "[A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor . . . and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee. The court may award under this section . . .

courts may now award prejudgment interest but only on actual damages in private antitrust actions[48] and only for the period between the commencement of the suit and the judgment provided that the court finds that the defendant acted in bad faith by engaging in dilatory behavior to delay the court proceedings. The amendment was interpreted as a change in the existing law, not a technical amendment or clarification, and therefore it has not been permitted retroactive application. See, e.g., *Fishman* v. *Estate of Wirtz*, 807 F.2d 520, 561–62 (7th Cir. 1986). Courts have refused to consider any award of prejudgment interest in actions that had been brought before the amendment was enacted but were decided afterwards. Id.

Nonetheless, even after the amendment permitting prejudgment interest, federal courts have refused to award prejudgment interest under 15 U.S.C. § 15 (a) (1982) unless there was proof that the defendant acted

---

simple interest on actual damages for the period beginning on the date of service of such person's pleading setting forth a claim under the antitrust laws and ending on the date of judgment, or for any shorter period therein, if the court finds that the award of such interest for such period is just in the circumstances In determining whether an award of interest under this section for any period is just in the circumstances, the court shall consider only- --

"(1) whether such person or the opposing party, or either party's representative, made motions or asserted claims or defenses so lacking in merit as to show that such party or representative acted intentionally for delay, or otherwise acted in bad faith;

"(2) whether, in the course of the action involved, such person or the opposing party, or either party's representative, violated any applicable rule, statute, or court order providing for sanctions for dilatory behavior or otherwise providing for expeditious proceedings; and

"(3) whether such person or the opposing party, or either party's representative, engaged in conduct primarily for the purpose of delaying the litigation or increasing the cost thereof."

[48] We note that there is a divergence in the federal act between damages available to private plaintiffs and to the United States as plaintiff. While prejudgment interest may be awarded to a private plaintiff on actual damages only; see 15 U.S.C. § 15 (a) (1982); the United States may recover prejudgment interest on its threefold damages. 15 U.S.C. § 15a (1982).

with *extreme bad faith.* See, e.g., *Zapata Gulf Marine Corp.* v. *Puerto Rico Maritime Shipping Authority,* 133 F.R.D. 481, 486–87 (E.D. La. 1990), appeal dismissed, 925 F.2d 812 (5th Cir.), cert. denied, 501 U.S. 1262, 111 S. Ct. 2917, 115 L. Ed. 2d 1080 (1991) (no prejudgment interest awarded where there was no evidence defendant acted in deliberate and extreme bad faith); *Automotive Products* v. *Tilton Engineering, Inc.,* 33 U.S.P.Q.2d (BNA) 1065, 1072 (C.D. Cal. 1993) (same). Indeed, our research indicates, with only the exceptions cited in footnote 46, that prejudgment interest has never been awarded by any federal court under 15 U.S.C. § 15 (a), nor has it revealed an award of prejudgment interest by a state court in an antitrust action. See *Zapata Gulf Marine Corp.* v. *Puerto Rico Maritime Shipping Authority,* supra, 487 n.4 (court and parties unable to find case where court imposed prejudgment interest under 15 U.S.C. § 15); *Automotive Products* v. *Tilton Engineering, Inc.,* supra, 1072 (although 15 U.S.C. § 15 permits imposition of prejudgment interest, no court has actually awarded them); 2 A.B.A. Antitrust Section, Annual Review of 1993 Antitrust Law Developments (3d Ed. 1994) p. 170 (there is no reported decision awarding prejudgment interest in an antitrust case under 15 U.S.C. § 15 [a]).

Like the federal statutes, § 35-35 mandates an award of treble damages, the award of attorney's fees and costs. We believe that § 35-35 provides an ample recovery in damages for an injured plaintiff. Federal courts have refused to consider an award of prejudgment interest prior to its specific inclusion in the federal statutes and even after the provision for prejudgment interest was included for a limited purpose, courts have declined to make any such award. Therefore, federal precedent reinforces our interpretation of the act. We conclude that prejudgment interest is not available to the plaintiff under the act.

In sum, we affirm the trial court's judgment that the defendant had violated the act and that the defense of immunity was not available to the defendant. We further conclude that the trial court properly awarded the plaintiff treble damages for lost profits and for the loss of the value of the business. We reverse, however, the trial court's decision to award prejudgment interest. Accordingly, the judgment is reversed in part and the case is remanded to the trial court with instructions to vacate the judgment of $1,048,260.96 and render judgment in favor of the plaintiff in the amount of $486,432.[49]

In this opinion the other justices concurred.

---

[49] Judgment shall enter in the amount of $12,144 for lost profits and $150,000 for the value of the lost business, totaling $162,144. These damages are to be trebled and the total judgment to be rendered is $486,432.