[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The above-captioned motor vehicle accident case was tried on its merits in a non-jury trial on January 17 and 18, 2001. At the close of the evidence, the plaintiff was granted leave to amend his complaint to conform the pleading to the proof adduced. In the operative complaint CT Page 1748 dated January 18, 2001, the plaintiff Elmer Cruz, alleges that he suffered an injury to his back as the result of an impact between a truck driven by defendant Fernando Lage in which he was a passenger and a school bus operated by defendant Edward Degnan (whose name is misspelled in the complaint) on behalf of defendant Dufour Transportation. The incident occurred on July 24, 1997, at approximately 1:47 p.m.
Lewis Tree Service Inc. filed a complaint as an intervening plaintiff seeking to recover worker's compensation benefits paid.
The plaintiff alleges that both drivers were negligent. He claims that defendant Lage's inattention to a traffic light that was turning from yellow to red caused him to stop the truck at a point beyond the stop line that preceded the intersection of North Main and Fourth Streets in Ansonia, making it difficult for the Dufour school bus to make a left turn into Fourth Street. He claims that the bus driver was negligent by making an improper turn and failing to steer the bus in a broad enough arc to avoid hitting the truck as he made the turn. The side of the bus, at a point about two-thirds from the front, hit the bar on the driver's side of the truck that supports the platform for the aerial lift on the truck. The plaintiff testified that the impact caused him to lurch forward and then back on the bench seat of the truck, and that several hours later he began to experience back pain that caused him to seek treatment the next day. He was found to have an injury to a lumbar disc for which he underwent laminectomy surgery in late September 1997. The plaintiff seeks damages for his lost wages, medical expenses, and noneconomic injuries and losses.
Findings of Fact
On July 24, 1997, the plaintiff was a passenger in his employer's tree service truck, which was driven by his supervisor, defendant Lage. The plaintiff, who was 33 years old at the time of the incident, had been working for the tree service company for less than a year. His job consisted of picking up and feeding into a wood chipper the branches and wood that fell to the ground as a co-worker trimmed trees. The plaintiff came to the Waterbury area from Puerto Rico at age twenty-two. He speaks English in informal settings but requested the services of an interpreter for the court proceeding. The court finds that it is not surprising that a person whose first language is not English would want an interpreter at trial, given the greater linguistic difficulties posed by examination by lawyers and by the formal language and verbal exactitude of court proceedings. The plaintiff is unable to read documents in English reliably. His prior employment in this country was as a factory worker.
After completing a tree-trimming job in Ansonia, the plaintiff and CT Page 1749 defendant Lage were driving to another job in the tree service truck. As Mr. Lage drove downhill on Fourth Street, intending to turn left at the traffic light at the intersection with North Main Street, he observed that the light turned yellow and then red. By the time he brought the tree service truck to a stop, the front of the truck had almost reached the curb line of North Main Street. Approximately 27 feet before the curb is a broad white line configured in the manner typical of highway stop lines.
The presence of the truck in the right hand lane of Fourth Street made it necessary for a long vehicle making a left turn into Fourth Street to proceed even with the open lane and make a precise ninety-degree turn into that lane. Instead, defendant Degnan, who was driving a full-size yellow school bus, proceeded on a diagonal from the point where he had just stopped to discharge several children. The court finds it probable that Mr. Degnan took a shortened, sloppy turn that he began on the right hand side of Fourth Street in order to complete his turn while the traffic light was still green. Mr. Degnan testified that the light had just turned green when he turned; however, the court did not find this testimony credible. Mr. Degnan testified that the light turned red as he approached the bus stop, that several children had to stand and collect their belongings and get off the bus, and that he had to wait to observe their route after they left the bus, then check the intersection and turn off his warning lights before making the turn. The court finds that it is likely that the light had been green for some time while the bus Mr. Degnan was driving was stopped, and that he turned the bus from that position and proceeded on a diagonal path rather than driving the bus forward to make a more precise turn into the uphill lane on Fourth Street. Realizing that the bus would not clear the tree service truck, Mr. Lage sounded his horn and waved. As a consequence of Mr. Degnan's negligent turn, the side of the bus struck a support bar that extends at the corner of the cab to the platform for the aerial lift on the truck.
Mr. Degnan testified that the truck moved forward just as he started to straighten out the bus from the turn; however, the court did not find this testimony credible. Both the plaintiff and Mr. Lage credibly testified that the truck did not edge forward after it first came to a stop.
When the collision occurred, the plaintiff was propelled forward and then back in his seat with enough force that he threw his arms forward to avoid hitting his head. He was not wearing a seat belt, so was unrestrained.
The Plaintiff's Claims of Negligence
CT Page 1750
A. Claims against Fernando Lage
Though the plaintiff's claims against his employer, Lewis Tree Service, Inc., were resolved against him by a motion for summary judgment invoking the bar of the worker's compensation statute, Conn. Gen. Stat. § 31-284, his claim against his fellow employee, Mr. Lage, for the allegedly negligent operation of a motor vehicle is expressly permitted by the Worker's Compensation Act at § 31-293a.
The plaintiff claims that Mr. Lage was negligent in the following ways:
 (a) failing to stop at a stop bar in violation of Conn. Gen. Stat § 14-299 (f);
(b) being inattentive;
 (c) failing to apply his brakes in time to avoid the collision;
 (d) failing to keep a reasonable and proper lookout and to pay attention to where he was going;
 (e) failing to sound his horn or give warning of the impending collision;
 (f) failing to keep and operate his vehicle under proper control;
 (g) failing to turn his vehicle to avoid the collision;
(Amended complaint, para. 8(a) — (g).
The court finds that Mr. Lage had no opportunity to turn or move to avoid the oncoming bus, given the suddenness of the bus' turn.
Mr. Lage was negligently inattentive or tardy in applying the brakes only if he failed to stop where he should have. That issue is controlled by the provisions of Conn. Gen. Stat. § 14-299. The plaintiff invokes subsection (f) of that statute, which provides as follows:
 If a traffic control signal, approved by the State Traffic Commission, is erected and maintained at a place other than an intersection, the provisions of this section shall be applicable except as to those provisions which by their nature can have no CT Page 1751 application. Any stop required shall be made at a sign or marking on the pavement indicating where the stop shall be made, but in the absence of any sign or marking the stop shall be made at the signal.
The plaintiff asserts that the second sentence of subsection (f) applies to all stops, not only to those at issue in that subsection, that is, stops in response to traffic control devices at locations other than intersections.
This construction cannot be adopted because Conn. Gen. Stat. § 14-299
(b) contains a specific requirement for stopping at a red light at an intersection:
 When traffic at an intersection is alternately directed to proceed and to stop by the use of signals exhibiting colored lights or lighted arrows, successively one at a time or in combination . . . said lights shall apply to drivers of vehicles and pedestrians and shall indicate the following: . . . (3) Red alone: Vehicular traffic facing a steady red signal alone shall stop before entering the crosswalk on the near side of the intersection or, if none, then before entering the intersection and remain standing until the next indication is shown.
"Intersection" is defined at § 14-212 (4) as "the area embraced within the prolongation of the lateral curb lines of two or more highways which join one another at an angle, whether or not one of the highways crosses the other."
There was no cross walk on Fourth Street at the point just before the traffic light at the intersection. Pursuant to the definition of "intersection" cited above, the intersection of two roads that were at right angles to each other, as Fourth Street and North Main Street were, is the square formed by prolonging the lateral curb lines of the two roads. The evidence did not establish that the truck driven by Mr. Lage ever entered "the intersection," as so defined, while the light was red.
Following customary principles of statutory construction, the court must give effect to the different requirements stated with regard to the place to stop for intersection lights and the place to stop for lights at locations other than intersections. Since § 14-299 (b) states that where a vehicle must stop in relation to a traffic light at an intersection, the court cannot interpret the different standard in subsection (f) as applying to lights at intersections as well as to CT Page 1752 lights at other locations. To do so would be to regard the provision in subsection (b) as superfluous and of no effect, a prohibited result, since no legislative enactment is to be viewed as surplusage. WestportTaxi Services, Inc v. Westport Transit District, 235 Conn. 1, 40 (1995);Rydingsword v. Liberty Mutual Ins. Co., 224 Conn. 8, 16 (1992).
It is appropriate to regard the reference to stop lines in subsection (f) as applying only to traffic control signals at a place other than an intersection because each subsection of the statute makes a specific provision for the conduct of the driver, so that the isolation of different requirements in different subsections should be respected, and requirements in one subsection should not be construed to apply to separate subsections that state different requirements.
The plaintiff makes the point that there must be some purpose for the marking that appears to be a stop line. As defendant Lage has observed, this line could be an artifact of a time when the intersection was controlled by a stop sign instead of a light. The court was not presented with evidence to indicate when or by what authority the line was placed. Since § 14-299 (b) states specifically where a motorist is required to stop, that is, "before entering the intersection," the court cannot use the unexplained presence of a painted line to impose a different requirement, that is, a requirement to stop twenty-seven feet back from the intersection. It may well be that other regulations of the State Traffic Commission impose stopping requirements with regard to stop lines preceding intersections; however, the plaintiff has not pleaded any such regulations. Since Practice Book § 10-3 requires statutes relied upon to be specifically pleaded, the court is limited to determining whether the plaintiff has proved a violation of the only statute he has cited in his pleading. Since that statute, § 14-299 (f) applies on its face only to traffic signals at locations other than intersections, it is not applicable to the facts proven.
The plaintiff has failed to prove that the vehicle in which he was a passenger was stopped at a location governed by the statute he has invoked, § 14-299 (f), since the traffic light at issue is at an intersection. He has not pleaded a violation of § 14-299 (b).
The claimed inattention and tardy braking did not result in the vehicle coming to rest at a point within the intersection, and the plaintiff therefore has failed to show that Mr. Lage was negligent in any of the ways alleged in his amended complaint.
Judgment shall enter in favor of defendant Lage.
B. Claims against Edward Degnan and Dufour Transportation
CT Page 1753
The claims of negligence that the plaintiff makes against defendant Degnan and the owner of the school bus he was operating, Dufour Transportation, are as follows:
 (a) he made an improper turn in violation of Conn. Gen. Stat. § 14-242a;
 (b) he failed to keep to the right of a vehicle proceeding in the opposite direction in violation of Conn. Gen. Stat. § 14-231;
(c) he was inattentive;
 (d) he was operating a vehicle with defective brakes or he failed to apply the brakes in timely fashion to avoid the collision;
 (e) he failed to keep a reasonable and proper lookout and to pay attention to where he was going;
 (f) he failed to sound his horn or give a timely warning of the impending collision;
(g) he failed to keep the bus under proper control;
(h) he failed to turn to avoid the collision;
Amended complaint, para. 8.
The plaintiff's citation to "14-242a" is apparently a citation to § 14-242 (a), since the General Statutes do not contain the former numbering. Conn. Gen. Stat. § 14-242 (a) provides that "[n]o person shall turn a vehicle at an intersection unless the vehicle is in a proper position on the highway as required by section 14-241 . . ." Conn. Gen. Stat. § 14-241 provides in pertinent part:
 (b) At any intersection where traffic is permitted to move in both directions on each highway entering the intersection an approach for a left turn shall be made in that portion of the right half of the highway nearest the center line thereof and by passing to the right of such center line where it enters the intersection.
Conn. Gen. Stat § 14-231 provides as follows: CT Page 1754
 [d]rivers of vehicles proceeding in opposite directions shall pass each other to the right, and upon highways having width for not more than one line of traffic in each direction each driver shall give to the other at least one-half of the main-traveled portion of the highway as nearly as possible.
Mr. Degnan conceded that if there is not room to turn his bus, which has a wide turning radius, into an intersecting street, he must wait until the intersection clears before making his turn. The court has found that he did not drive forward to make the left turn on to Fourth Street in the manner proscribed by law, but that he proceeded in a diagonal path that cut the turn short and resulted in the bus' entry into the left lane of the street into which he turned the bus, failing to turn in a manner that avoided collision. He was inattentive in that he failed to observe that he could not complete the turn safely from the position from which he began it.
The court finds that the other allegations of negligence are inapplicable to the situation and were not proved.
C. Causation
The principle issue at trial was whether the collision of the vehicles that resulted from Mr. Degnan's negligence caused an injury to the plaintiff's back. Applying the civil standard of proof to the issue of proximate cause, the court finds that, more probably than not, the collision was both a cause-in-fact and a proximate cause of the injuries and losses that the plaintiff claims.
The defendant Mr. Degnan tried to minimize the effects of the collision, but he did testified that he did not actually observe what happened to the plaintiff at the time the truck was struck. The plaintiff began to experience pain in his back in the evening, and the next day mentioned to his supervisor, Mr. Dyckman, that he had hurt his back. Mr. Dyckman responded, "Are you kidding me?" The court infers that this unreceptive response was a likely reason for the plaintiff's failure to comment further on his back pain to those at his place of work, where he had been employed for less than a year.
The plaintiff, who had never before experienced problems with his back and who had never before been treated for back pain, sought out treatment by finding the name of a chiropractor in the Waterbury telephone directory. He visited the chiropractor the day after the accident. The chiropractor's treatment notes indicate that the plaintiff reported that CT Page 1755 he was experiencing back pain that radiated into his thighs. The chiropractor sent the plaintiff for an MRI, suspecting a disc problem. The plaintiff continued to report to his job but visited the chiropractor on July 25, July 28, July 30, and August 1, 1997. On August 4, after a full day of work which included an emergency call to free a power line in the middle of the night, he went to the chiropractor experiencing excruciating pain. He called his employer and reported that he was going to the hospital.
Results from the MRI, which was performed on August 5, 1997, indicated disc herniation in the lumbar spine with compression of the L5 nerve root. The plaintiff stopped working and continued to visit the chiropractor for palliative care until he met with the orthopedic surgeon, Dr. Thomas Arkins, to whom the chiropractor had referred him. Dr. Arkins found on August 19, 1997, that the plaintiff was "temporarily totally disabled" by his injury. On August 27, when the plaintiff returned with a translator, he was experiencing pain down the right leg in a sciatic distribution. A second MRI revealed a "non-contained disc at the L3-4 level . . ., with partial free fragmentation over the L4 body" and "considerable stenosis at this level which makes the disc herniation all the more compressive bilaterally." Dr. Arkins observed that the MRI findings and Mr. Cruz' symptoms of pain first down one leg, then down the other, were compatible and confirmed "bilateral involvement" extending down to the middle toe.
Dr. Arkins noted that the plaintiff had "sensory loss and pain both at L4-5" and "in the L5 distribution," and performed surgery. Upon inspection, Dr. Arkins found a ruptured disc with a free fragment herniation just over the body of L4 and a bulging disc at L4-5. He excised the disc material and fragment at L3-4 only.
The plaintiff had diminished pain for the first few weeks following surgery but then continued to experience pain in his back, radiating into his left leg. He had also developed foot drop. He underwent a course of physical therapy but continued to be unable to walk, stand or sit for extended periods without pain. A year after his surgery, he was working as a security guard twelve hours a week and experiencing considerable pain, using a cane. When Dr. Arkins examined him in April of 1999, the plaintiff was still experiencing too much pain to work more hours, and the doctor prescribed medication that the plaintiff could not take because it failed to diminish the pain in his leg and it caused drowsiness. In the April 30, 1999 report, Dr. Arkins noted that "I do not think we have anything else we can offer Mr. Cruz surgically"and in June 1999, considered whether Mr. Cruz might be eligible for the chronic pain clinic at Yale. With no medical insurance, Dr. Arkins noted on June 22, 1999, Mr Cruz was unable to receive treatment. On December 17, 1999, Dr. Arkins CT Page 1756 wrote that "[b]ecause of the severity of his pain, it is my recommendation that he remain out from work until January 15, 2000."
Dr. Arkins issued a report on March 20, 1998, in which he stated that "[w]ith respect to Elmer Cruz, based on the history available to me, it is my feeling that there is reasonable medical certainty that there is a causal relationship between the injury sustained by Mr. Cruz and the motor vehicle accident which occurred on July 24, 1997." Dr. Arkins stated in a letter dated July 20, 1998 that the plaintiff has a twenty percent permanent partial disability to his back "due to severe lumbar sprain syndrome and residuals of lumbar disc surgery". In functional terms, the injury to his back has left the plaintiff in pain daily. He is unable to lift, and his back hurts him on an almost constant basis, with no lasting comfort in an any position. When he became unable to perform his part time job as a security guard in December 1999, he was unable to return to any work, and he lives on social security disability benefits of $1,123.20 per month that he has been receiving since April 11, 2000.
The defendant has offered no convincing factual basis to rebut Dr. Arkins' opinion that the unmistakably real and serious back injury for which he treated the plaintiff was caused by the motor vehicle collision of July 24, 1997. Neither driver observed what happened to Mr. Cruz. While both minimized the force of the collision, both continue to be employed at the same jobs, a circumstance that may very well color their perceptions of the impact.
Defendant Degnan asks this court to reject the plaintiff's evidence on causation based on little more than free-floating skepticism. The defense makes the point that the plaintiff worked for several days immediately following the accident, and that he made no complaint. The plaintiff was earning $9.72 per hour, earning only around $400 per week gross pay. He testified that he did mention his injury, but was scoffed at by the supervisor, Mr. Dyckman. He had been working at the tree service for less than a year. There was no evidence that he would be paid sick leave. Under these circumstances, the fact that he went to work appears to be the result of economic need. The MRI finding of a ruptured disc impinging on nerves and the observations of Dr. Arkins defeat the defendants' doubt that injury occurred.
The defendants presented the testimony of a witness, Jeffrey Muttart who, after a few years as police officer in Groton, opened a business investigating accidents and testifying, mostly for insurance companies. The court finds that his opinions are not worthy of weight. The defendants disclosed the content of his opinions weeks before they had even contacted him. Mr. Muttart's view that the impact between the bus and the truck was not a forceful one does not, moreover, address the CT Page 1757 question whether it was forceful enough to trigger a disc herniation.
Dr. Arkins, whose familiarity with medical consequences of impacts seems to the court to make his testimony a more reliable basis for drawing a conclusion, opined that the injury was caused by the impact. The chiropractor who testified also opined that the motor vehicle collision caused the plaintiff's injuries. The defendants ask this court to disregard these opinions on the basis of surmise and guess work — perhaps the plaintiff had been experiencing back pain in the past? There was no evidence that he had, nor of any treatment for back pain of any kind. Perhaps the plaintiff had suffered some other trauma? There was, again, no evidence. The plaintiff denied he had been involved in any prior car accidents or falls. There was no delay in his injury. He experienced back and leg pain in the evening, and he went for care the next day, to a practitioner who made findings of symptoms of trauma. While it may seem surprising that so considerable an injury would result from the collision that occurred, surprise is not a basis for rejecting evidence. Though common prejudice and cynicism may assume that unless damage to vehicles is great, damage to human bodily structures cannot occur, common, everyday experience is to the contrary. The civil standard of proof does not require proof to an absolute certainty: the standard is whether a plaintiff "induce[d] in the mind of the trier a reasonable belief that it is more probable than otherwise that the fact or issue is true." Tait's Handbook of Connecticut Evidence (2001) § 3.5.1, citingBusker v. United Illuminating Co., 156 Conn. 456, 458 (1968). The plaintiff's proof met that standard with regard to causation.
Defendants Degnan and Dufour asserted no special defenses. The court finds in favor of the plaintiff on the issue of liability.
Damages
As has been detailed above, the plaintiff has suffered a substantial injury to his back that has limited his daily activities and curtailed his ability to be employed in the kinds of physically demanding, unskilled jobs by which he has earned his living, given his inability to read English. Dr. Arkins has offered the credible opinion that the plaintiff has a 20% permanent partial disability to his back, from which he will suffer for his statistical life expectancy of 35.5 pears. The court finds that the following amounts constitute just, fair and reasonable damages for the injuries and losses proven to have been proximately caused by the negligence of defendant Degnan:
 Economic damages: $32,367.23 medical bills and expenses $69,291.42 lost wages CT Page 1758
 The lost wages are calculated as follows: August 5, 1997 — May 11, 1998 = $15,186.40 May 11, 1998 — December 11, 1999 = 19,891.78 December 11, 1999 — April 11, 2000 = 6,454.22 April 12, 2000 to 2005 = 27,759.02
The court has calculated lost wages to the year 2205 and not to retirement age because the plaintiff's ability to speak and write English is likely to improve over time, enhancing his prospects of obtaining employment that is less physically demanding. The plaintiff completed eleven years of schooling in Puerto Rico and was able to perform the verbal duties of a security guard before the physical demands of that work became too great.
The evidence indicates that the plaintiff is receiving social security disability benefits. The parties agreed that these benefits should be treated as an offset in calculating the lost wages, and the court has therefore deducted them in the award of economic damages set forth above.
The plaintiff's back injury has turned him from a robust physical laborer to a person who cannot walk, sit or stand without pain, and who cannot trust his leg not to give way as he walks. He has suffered much pain and will continue to suffer from pain and disability in the future. He also suffered a painful surgical procedure and its sequelae. Dr. Arkins has opined that his disability is permanent. The court finds that $250,000 is full, fair and reasonable compensation for his noneconomic losses and injuries.
 Non-economic damages $250,000.00 TOTAL: $420,950.07
Conclusion:
The court finds that the plaintiff has failed to prove any of his claims of negligence against defendant Fernando Lage. Judgment shall enter in favor of Fernando Lage. The plaintiff has proved his claim against defendants Edward Degnan and Dufour Transportation and shall recover damages in the amount of $420,950.07 from these defendants.
The plaintiff has appealed from a denial of worker's compensation benefits. If the parties are unable to agree on the effect of any eventual award of such benefits on the plaintiff's recovery, they shall file an appropriate motion with the court.
Lewis Tree Service filed a complaint as an intervening plaintiff, CT Page 1759 alleging that the plaintiff had filed a claim for worker's compensation but that it had not yet paid any benefits pursuant to that claim. Because the intervening plaintiff proved no payment of benefits at the time of trial, judgment 1 shall enter against the intervening plaintiff, Lewis Tree Service.
The plaintiff shall recover his costs upon filing a bill of costs with the clerk of the court.
Beverly J. Hodgson Judge of the Superior Court