[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION ON MOTION TO SET ASIDE VERDICT
In this case, an unsuccessful bidder on a five-year contract to transport school children for the defendant City of Hartford has sued the City. Three companies submitted sealed bids for the contract which was to commence in September, 1998.
The basic allegation of the plaintiff was that because of a conspiratorial agreement between a union and the City the contract was not awarded to it although it was the low bidder. The union was not sued. The complaint alleged constitutional violations, breach of contract and violation of the state antitrust law.
A hearing on the plaintiff's motion for a temporary restraining order was held on July 28, 1998 — by motion, the plaintiff sought to restrain the City from awarding the contract to any company other than the plaintiff. After the hearing, but before a decision, the City executed a five-year contract with Laidlaw Transit, Inc. The contract was signed August 4th and the court issued a decision denying the plaintiff's motion on August 7, 1998. No appeal, of course, was or could be taken from the plaintiff's request for temporary relief. CT Page 2859
Before trial in this matter, the court dismissed the breach of contract action. Trial commenced September 15, 2000. On September 20, the court granted the City's motion for a directed verdict as to the claims of constitutional violations and submitted only one claim to the jury-alleged violation of the state Antitrust Act. The jury returned a verdict of $500,000.
Now the defendant City has moved to set aside the verdict on three separate grounds (A) the court lacks subject matter jurisdiction to award damages against the City on the antitrust claim; (B) there was no evidence submitted upon which a reasonable jury could have concluded that the City conspired to restrain trade; (C) there was no evidence upon which a reasonable jury could have concluded that the plaintiff suffered damages or an antitrust injury.
The plaintiff points to cases holding that a jury verdict "will be set aside only if [the court] find(s) that the jury could not reasonably andlegally have reached their conclusion," Bound Brook Assn. v. Norwalk,198 Conn. 660, 667 (1986). The court must determine whether the evidence "reasonably supports the jury's verdict," Childs v. Barnes, 235 Conn. 107,112 (1995). Indeed, "Litigants have a constitutional right to havefactual issues resolved by the jury," Mather v. Griffin Hospital,207 Conn. 125, 138 (1988) (underlining by court). All of this true, but it is also true that the court cannot avoid its responsibility to decide issues of law and to determine whether a verdict is reasonably and legally based on the evidence. This case would have benefitted from preliminary motions to strike or for summary judgment testing the legal sufficiency of the allegations of the complaint. As it was the court dismissed two of the plaintiff's theories of liability and made it clear to counsel that it would allow the antitrust claim to go to the jury because it was not prepared to rule on its ultimate viability at trial but would closely examine that issue if the jury were to return a verdict in the plaintiff's favor. In any event, the court will first discuss the subject matter jurisdiction question.
 1.
The question presented is whether in light of Brunoli, the claim made here under the state antitrust act (§ 35-24 et seq) is viable. The court will in part refer to federal case law interpreting the Clayton Act. There are no many appellate or trial court cases interpreting the state antitrust act but § 35-44 (b) does state that it is the legislature's intent that in construing our act "the courts of this state shall be guided by interpretations given by the federal courts to federal anti-trust statutes." CT Page 2860
Certain basic principles should be set forth. First, it seems clear that a municipality can be sued under our antitrust act; § 35-25 (b) gives a broad definition to the word "person and that word is later used to define the parties that can make a claim for injunctive relief or treble damages under the act and the parties who are subject to the provisions and penalties of the act, see § 35-31 (b), cf. § 35-38.
In Westport Taxi Service, Inc. v. Westport Transit District, 235 Conn. 1
(1995), a verdict against a public entity under the act was upheld where the entity was an agency formed by various towns pursuant to § 7-273
(b) of the General Statutes; also see fn. 26 at page 26, which assumes municipalities can be sued under the state act. Under the federal antitrust law, it has been held that a municipality is a "person" under the act and thereby subject to the antitrust laws, City of Lafayette v.Louisiana Power Light, 435 U.S. 389 (1978); also see The Law ofMunicipal Corporations, McQuillin 3d ed. Vol. 17, § 49.94, page 534.
Secondly, it is black letter law that . . . "any attempt to predetermine the outcome of competitive bidding is automatically illegal. It does not matter that the participants had good intentions. Nor does it matter whether the prices at which the bids were fixed were reasonable. All bid-rigging is unlawful under the Sherman Act," from Modern Federal Jury Instructions," Sand, Siffert, Reiss, Batterman, Vol. 4, Instruction 79-16, page 79-45; also see Addyston Pipe Steel Co. v. U.S.,175 U.S. 211, 237 (1899). Certainly, an agreement among competitors to submit rigged bids is a per se violation of the Sherman Act, U.S. v.Brighton Bldg. Maintenance Co., 598 F.2d 1101, 1106 (CA 7, 1979), there is no reason why an agreement, for example, between the entity advertising for the bids and another interested party to rig the bidding would not be a violation of the federal act and ours.
Finally, it is also of course true that under our antitrust act injunctive relief is provided for [§ 35-34] as well as treble damages [§ 35-35].
With these premises in mind, the question that must be resolved under this motion is whether assuming in the first instance that a claim of an antitrust violation can be made under the act will damages lie against a municipality in a case where a public contract was not awarded to the lowest bidder?
The defendant City takes the position that cases like Brunoli v. Townof Branford, 247 Conn. 407 (1999), and cases which Brunoli relied upon such as Ardinare Construction Co. v. Freedman, 191 Conn. 497 (1993);Spiniello Construction Co. v. Manchester, 189 Conn. 539 (1983); and JohnJ. Brennan Construction Corp., Inc. v. Shelton, 187 Conn. 695 (1982) make CT Page 2861 clear that a party does not have standing unless it has a legal or equitable right or interest in the subject matter of the controversy. Even the lowest bid is only an offer which until accepted by a city creates no contract; "the competitive bidding statute (does not) provide the disappointed bidder with standing," see Ardinare at 191 Conn. Pp. 501-506.
A party does have a limited form of standing when "fraud, corruption or favoritism has influenced the conduct of the bidding officials or when the very object and integrity of the competitive bidding process is defeated by the conduct of municipal officials," see Spiniello at 189 Conn. P. 543. That limited form of standing is in effect the right to apply for injunctive relief. Brunoli, 247 Conn. At p. 412.
The defendant city points to the various policy reasons advanced inBrunoli for not allowing a damage action in that case against the Town of Branford. The court pointed out that: "If, however, an unsuccessful bidder is permitted to assert a claim for money damages, rather than injunctive relief against awarding the contract to the successful bidder, the taxpayers of the municipality would be subject to paying once to have the work performed by the successful bidder and if the unsuccessful bidder were successful, again for damages above and beyond the cost of the project. . . . Further, a municipality must know, in advance of awarding a contract, what the ultimate costs of the project will be. If an unsuccessful bidder were able to eschew a claim for injunctive relief and assert a claim for damages, the municipality would not know with certainty what these costs are until the limitations period for such a claim for damages had passed. . . . Finally, recognizing standing to an unsuccessful bidder to seek money damages effectively would eliminate the availability of injunctive relief in this context. It is well established that "a party seeking injunctive relief has the burden of alleging and proving irreparable harm and lack of an adequate remedy at law' . . . If an unsuccessful bidder had an action in damages available to it as an alternative form of relief, we fail to see how it would ever be a qualified candidate for injunctive relief. This would eliminate the more efficacious remedy, to the detriment of the public," Brunoli, 247 Conn. At pp. 414-416.
All of these policy reasons serve just as adequately to argue against any damage award based on a violation of the requirements of bidding statutes whether that violation emanates from a claimed breach of contract (as the plaintiff characterizes Brunoli), or from an alleged tort, constitutional, or antitrust claim. The defendant City also has cited Connecticut Associated Builders Contractors v. City of Hartford,251 Conn. 169 (1999) and St. John v. State of Connecticut,9 Conn. App. 514, 522 (1987), which, although not directly on point, CT Page 2862 involved situations where complaints in the state and municipal bidding contexts were involved. In those cases, the defendant argues that standing limitations were not limited to complaints based on a breach of contract theory; constitutional claims were made in ConnecticutAssociated Builders, a general allegation of illegality, and a claim that the authority of the City code was exceeded was also made,251 Conn. at p. 171-174.
In Brunoli itself, the revised complaint not only alleged that the town "breached its agreement to award the contract to the lowest qualified bidder," but in separate paragraphs alleged violations of the town code and "favoritism," 247 Conn. p. 419.
On the other hand, the plaintiff argues that Brunoli should be confined to its facts or to the claim actually asserted in deciding whether a damage action should be allowed. It relies on a somewhat cryptic sentence at page 412 where the court said "standing must be derived from a source other than its bid submitted in response to an invitation to bid. That source is the municipal bidding statutes themselves." From this, the plaintiff deduces that "an unsuccessful bidder is limited to injunctive relief where the "source' or the cause of action is the municipal bidding statutes," p. 17 of October 23, 2000 brief, but a plaintiff is not so limited when there is another "source" for the action in damages. The language won't bear the burden of such an argument — immediately prior to the phrase quoted from Brunoli, the court was discussing whether under general contract theory the bid afforded any rights. The court was merely saying no it does not and for any rights at all the unsuccessful bidder must turn to the bidding statutes and where fraud or corruption are shown injunctive relief will lie.
The plaintiff does not respond to any of the policy arguments discussed in Brunoli which would present themselves no matter what label is put on a particular theory of recovery — in fact, since the policy considerations are the same no matter the theory it is difficult to understand why changing the label of the cause of action should produce a different result from that in Brunoli.
The plaintiff does list a series of terrible consequences that would flow if damages were not to be permitted — municipal officials could commit fraud, accept kickbacks and bribes "without exposure to damage claims." For one thing, the personal liability in damages of municipal officials who might be responsible for such transgressions is not before the court but rather the different question of the liability of the municipality itself. Furthermore, in Brunoli, the court posited situations where "fraud, corruption or favoritism," id. P. 414, might be before a court and said even then only injunctive relief is available. CT Page 2863 The gravamen of Brunoli was not that we recognize a "breach of contract" action in these situations but on such a claim you are entitled to injunctive relief not damages — the point of Brunoli was to say there is no breach of contract action but to protect the integrity of the bidding statutes we will allow you to bring an action for injunctive relief only, you will act as a private attorney general and any benefit inuring to you will arise if the injunctive relief is granted and the improperly awarded contract is rescinded. No matter how any claim is framed where fraud, corruption or anti-competitive practices in the bidding process is involved, the template for determining whether the public purposes have been thwarted is the bidding statute itself, so in effect, Brunoli's reasoning implies not only was there no damage remedy in a case where breach of contract is alleged but that there is no standing to make any damage claim by an unsuccessful bidder apart from what label is given to the claim that is made.
That appears to be the almost universal rule in the courts. Cases in the area are collected in an article in 65 ALR 4th 93, "Public Contracts: low bidder's monetary relief against state or local agency for nonaward of contract." The article at page 99 states:
 "With regard to tort theories of recovery, while there is authority from one jurisdiction that a public contractor whose low bid is arbitrarily rejected without opportunity for notice and hearing may be entitled to damages for violation of his (sic) constitutional and statutory due process rights, most courts have held that laws governing competitive bidding are enacted for the benefit of the general public, not individual bidders, and that a violation of those laws, being a breach of a duty flowing to the general public rather than to individuals, is not actionable in damages by a disappointed low bidder."
In that article, only one case is referred to allowing a private antitrust action against a city where a complaint alleged collusion between a public authority and a private contractor to develop bid specifications favoring the latter's equipment, City of Auburn v. Mavis,468 N.E.2d 584 (Ind., 1984). Even in that case, lost profit damages were held not to be appropriate but the court awarded treble damages as to attorney's fees and the expenses of preparing the bid; cf. North andEquities, Inc. v. Gateway Ctr. Corp., 441 F. Sup. 259 (E.D., Pa., 1977), court held unsuccessful offeror on government lease did not have damage action under federal procurement statutes; court noted claim made under Sherman Act but it was dismissed since the complaint did not set forth grounds it was based upon. These were the only two cases the court CT Page 2864 has been able to find referring to the operation of antitrust statutes in the context of suits for damages against a public authority in the context of statutes requiring awards to go to the lowest bidder.[1]
In any event, simply on a Brunoli standing and subject matter jurisdiction analysis the court concludes that in light of Brunoli, this court does not have subject matter jurisdiction to entertain a damage action against the defendant no matter what label is placed upon the theory of recovery.
But the question of whether damages can be awarded under the antitrust statute can be approached from a different perspective than iron laws of standing and jurisdiction. In other words, we have an important state policy that is sought to be effected by application of municipal and state laws on competitive bidding. Does that state policy require that the ambit of the antitrust statute insofar as it provides for damages be limited? That is, does the coexistence of two state policies reflected in two sets of laws require that by implication one or the other be amended? As noted, § 35-44 (b) directs our courts to look to the federal courts and their interpretation of federal antitrust statutes as a guide in interpreting our law.
In Silver v. New York Stock Exchange, 373 U.S. 341 (1963), the federal Supreme Court examined the question of whether and to what extent the Securities Exchange Act modified the federal antitrust laws and exempted certain entities from the operation of those laws. The court said at page 357:
 "The Securities and Exchange Act contains no express exemption from the antitrust laws or, for that matter, from any other statute. This means that any repealer of the antitrust laws must be discerned as a matter of implication and "it is a cardinal principal of construction that repeals by implication are not favored . . .' Repeal is to be implied only if necessary to make the Securities Exchange Act work, and even then only to the minimum extent necessary.
This is the guiding principle to reconciliation of the two statutory schemes." cf. U.S. v. Borden Co., 308 U.S. 188, 198 (1939); Georgia v.Pennsylvania R. Co., 324 U.S. 439, 456 (1945); California v. FederalPower Comm., 369 U.S. 482, 485 (1962). The court said in the Borden Co.
case: "When there are two acts upon the same subject, the rule is to give effect to both if possible," and later on the same page the court said for a portion of a law to be repealed, "There must be `a positive repugnancy between the provisions of the new law; and those of the old; CT Page 2865 and even then the old law is repealed by implication only pro tanto to the extent of the repugnancy,'" 308 U.S. at pp. 198-199.[2]
The goals sought to be achieved by the municipal and state competitive bidding laws are apparent and quite concrete. For various public works and governmental responsibilities that are to be carried out by private concerns, the bidding laws seek to secure the most competent people at the lowest price to carry out contracts as efficiently and with as little delay as possible. A primary objective of course is to save the taxpayer money.
To permit an unsuccessful bidder to bring an antitrust damage action against a municipality, for all the reasons stated in Brunoli, would defeat the very purposes of these acts — the taxpayers would pay to have the work performed and if the unsuccessful bidder were successful in its suit the taxpayer would have to pay again; the municipality could not engage in rational fiscal planning since the unsuccessful bidder has the statute of limitations in which to sue; permitting money damages would undermine any claim for injunctive relief — there would be an adequate remedy at law, thus the most efficacious remedy would be eliminated, see Brunoli at 247 Conn. pp. 414-416.
Besides if the antitrust law were held to apply in a case like this results repugnant to the goals of the bidding laws would reach almost ludicrous dimensions. Our statute like the federal antitrust law provides for treble damages — under both statutes such damages are mandatory. At common law punitive damages against municipalities were not allowed unless expressly authorized by statute or statutory construction. Hartford v. Assn. of Firefighters. Local 760,49 Conn. App. 805, 817 (1998). But given the broad language in the federal antitrust statutes and the federal view that the statutes applied to municipalities unqualifiedly the federal courts had ruled that treble damages against cities were mandatory before the passage of the Local Government Act of 1984, which barred all damage claims against cities under the federal antitrust statutes, Grason Electric Co., et al v.Sacramento Municipal Utility District, 526 F. Sup. 276, 281 (E.D.Cal., 1981). Treble damages were mandatory under the federal law and are mandatory under our antitrust law. The Fifth and Tenth Circuits had even found error in informing the jury about the treble damage provision on federal antitrust law since a plaintiff is entitled to them as a matter of law, Pollach Riley, Inc. v. Pearl Brewing Co., 498 F.2d 1240, 1242
(CA. 5, 1974); Semke v. Enid Auto Dealers Assn., 456 F.2d 1361, 1370
(CA. 10, 1972). Treble damages were awarded against the transit district in the Westport Taxi Service, Inc. case, 235 Conn. at p. 3.
To apply the state antitrust laws in a case like this then with their CT Page 2866 provision for treble damages would completely defeat the purposes of the municipal and state bidding laws by enormously increasing costs in these situations besides making any request for injunctive relief or even the desire to do so a non-factor.
Also given the fact that the antitrust law can lead down many trials applying them willy nilly to a situation as presented here would lead to even stranger monetary results. Assuming the contract between Laidlaw and the City is illegal but Laidlaw had no knowledge of the illegality because the agreement to rig the bidding procedure was not between the City and Laidlaw but allegedly with the union, then Laidlaw as an innocent party and could also sue the City, see Restatement (Second) Contracts, § 180, cf. Law of Contracts, Calamari Perillo, § 22-2, p. 891.
Finally, the court has referred to the federal Local Government Act of 1984. That act (15 U.S.C. § 34-36) barred application of the damage provisions of the federal antitrust law to municipalities but permitted actions for injunctive relief. As noted, § 35-44 (b) requires our courts to look to the federal courts' interpretation of the federal antitrust law. In footnote 26 of the Westport Taxi case, page 26, Justice Berdon had some interesting observations.
 "The defendant also argues that because the federal antitrust laws exempt local government from liability, it should also be protected under the Connecticut act. In 1984, long after the actions at issue in this case took place, the Local Government Antitrust Act was enacted, which exempts local government entities from federal antitrust damage awards. 15 U.S.C. § 34-36 (1989). Prior to the amendment, however, municipalities were liable under federal law for treble antitrust damages. See Palm Springs Medical Clinic, Inc. v. Desert Hospital, 628 F. Sup. 454, 459-60 n. 4 (C.D.Cal. 1986). In Connecticut, municipalities have not been exempted by statute from antitrust damages. Accordingly, we reject the defendant's argument that its actions during 1977 and 1978 should be exempt from antitrust liability."
Here, of course, the complained of actions took place well after the passage of the Local Goverrunent Act of 1984. Although it does not involve a construction by the federal courts of federal statutes our legislature did want our law to be guided by federal antitrust legislation and Justice Berdon did not summarily dismiss the applicability of the 1984 act to our statute and its interpretation. CT Page 2867
In any event, the true purposes of antitrust legislation must not be forgotten. In 54 Am.Jur.2d, "Monopolies and Restraints of Trade," talking of the Sherman Act it is said that: "The Act is not directed against conduct which is competitive, even severely so, but it is directed against conduct which unfairly tends to destroy competition itself. Itdoes so not out of solicitude for private concerns but out of concern forthe public interest," (emphasis added), Spectrum Sports v. McQuillan,506 U.S. 447, 458.
As to the municipal and state competitive bidding statutes, it has been said that:
 "A bidder for public work cannot base a right of action for damages against the public body, upon a statutory requirement that contracts for the performance of public work shall be let to the lowest bidder and cannot recover lost profits in case the contract is contrary to the statute, awarded to a higher bidder. Such a statutory provision enacted as a protection to the public cannot be used to make disobedience of its provisions by public officers a double source of punishment to the public body . . ." 64 Am.Jur.2d, "Public Works and Contracts, § 86, p. 948. (Emphasis added.)
To allow antitrust damages here would be repugnant to the public benefit purposes of the municipal competitive bidding laws and would not therefore comport with the similar objectives of the antitrust laws to benefit the public not competitors and lead to results the legislature could not have intended. So apart from the lack of standing and subject matter jurisdiction reasons for denying the damage claim the court also concludes the antitrust statute should not be construed to provide for damages against municipalities since permitting such damages, would conflict with the purposes of municipal and state competitive bidding statutes. The purposes of the antitrust laws are not thereby defeated since injunctive relief can still be sought under that law (§ 35-34) and the act is effectively repealed only insofar as it deleteriously interferes with other important state policy as reflected in the bidding statutes. The plaintiff is not deprived of all relief since the avenue of injunctive relief was open to it and such relief serves as an effective compromise between the policies of the antitrust act and the bidding statutes. Interestingly, enough on the particular facts of this case the plaintiff had a different path of monetary relief under our antitrust laws — it could have, but did not, sue the union. CT Page 2868
In any event, the verdict is set aside for the foregoing reasons.
 2.
In light of the just concluded discussion, the pendency of a hearing on the injunction and the court's ruling that Laidlaw is a necessary party, but also taking into account that under certain circumstances not yet before the court that it may not be an "indispensable" party the court will not now discuss the second ground for the motion to set aside the verdict — that no credible evidence was presented to support a finding by the jury that there was evidence to support the jury's conclusion that defendant conspired to restrain trade.
 3.
The court does not believe similar restraints prevent it from discussing the third ground put forth as a reason to set aside the verdict — an antitrust injury was not shown, that is, here that at least the claim for lost profits was not established and no reasonable jury could find to the contrary. The question presented here is whether the evidence presented allowed the jury to reasonably conclude that lost profits in the amount of $500,000 should be awarded. On a motion to set aside a verdict, it is true that every inference must be exercised in favor of upholding the verdict; on the other hand, as previously discussed, there must be a reasonable basis for the jury's decision.
 (a)
As to lost profits, the general rule is that they "will be allowed only if their loss is capable of being proved, and is proved, with a reasonable degree of certainty. No recovery can be had for loss of profits which are determined to be uncertain, contingent, conjectural or speculative," 22 Am.Jur.2d, "Damages," § 625 at page 685.
Connecticut has subscribed to this view for many years. In Belisle v.Berkshire Ice Co., 98 Conn. 689 (1923), the court upheld the trial court's conclusion as to the appropriate damages saying that the damages claimed "were not remote, uncertain or speculative" and that: "The loss of profits is always a proper subject for compensation if such loss can be shown with reasonable certainty," id. page 700.
A good statement of the law is set forth in 24 Leggett Street Ltd.Partnership v. Beacon Industries, Inc., 239 Conn. 284, 309, where the court said:
 "Although damages often are not susceptible of exact CT Page 2869 pecuniary computation and must be left largely to the sound judgment of the trier; Johnson v. Flammia,
[169 Conn. 491, 500, 363 A.2d 1048 (1975)]; this situation does not invalidate a damage award as long as the evidence afforded a basis for a reasonable estimate by the [trier] of that amount. Paiva v. Vanech Heights Construction Co., 159 Conn. 512, 517, 271 A.2d 69 (1970)." (Internal quotation marks omitted.) Conaway v. Prestia, supra, 191 Conn. 494. "Mathematical exactitude in the proof of damages is often impossible, but the plaintiff must nevertheless provide sufficient evidence for the trier to make a fair and reasonable estimate. . . ." (Citations omitted.) Falco v. James Peter Associates, Inc., 165 Conn. 442, 445, 335 A.2d 301 (1973).
Also see Restatement (Second) Contracts, § 352.
A few more generalized comments are also helpful. The plaintiff had been in the business of school transportation for local school districts for some time but it had never transported children in the City of Hartford. This in itself would not prevent a lost profit recovery.
 "If the proof is persuasive, a lost profit recovery is appropriate, even with new businesses. For instance, proof of sales and profits of comparable businesses,
especially on the sale of mass produced, standardized goods at standard prices, may satisfy the proof requirements. The plaintiff's own profit history in a comparable business, or in the same one at a different location, may also suffice. The most persuasive evidence is often in the form of detailed business statistics or marketing and production information, coupled with expert testimony. But even statistics may turn out to be inadequate unless they are rigorously tested and conform to common sense expectation," Dobbs, Law of Remedies Vol. 1, § 3.4, pp. 320-321. (Emphasis added.)
Thus, the "reasonable certainty" test applies even where a lost profit claim is made regarding a new business or venture. In Beverly HillsConcepts, Inc. v. Schatz, Schatz, Ribicoff Kotkin, 247 Conn. 48
(1998), the court quoted an Alabama case to the effect that "recovery of lost profits is not predicated on whether a particular business is categorized as new or existing where the defendant has wrongfully prevented it from coming into existence. But the courts must still focus CT Page 2870 on whether the plaintiff has presented evidence from which the fact finder could "with reasonable certainty' calculate the amount of lost profits," id. p. 66.
If we turn to proof problems, as just indicated one way to prove lost profits is to set forth the plaintiff's own profit history in a comparable venture. Where a job or contract has been lost through the wrongful conduct of another this can be an effective method to show lost profits. At § 12.4(3), pp. 72-73, Dobbs says in Volume 3:
 "Plaintiff's own comparable past experience. The plaintiff's own experience with a comparable job or enterprise is relevant in assessing the plaintiff's loss from the defendant's breach. Thus the plaintiff may recover estimated profits lost when he starts a new method of operation, or moves an old business to a new location, or in the case of a builder, starts a new project, provided that in each case, he can establish that the past experience is sufficiently comparable to permit the conclusion that similar profits would have been made in the new enterprise."
True, there is a claim under the antitrust laws and calculating damages in antitrust cases where lost profits are claimed is said to present difficult problems. But there is no a priori reason that this should generally be the case — the observation is probably based on the fact that antitrust cases often involve situations where competitors are kept from entering new product markets or the fact that the wronged party has not been allowed to operate freely in a market of whatever type makes it difficult for a chairman to offer non-speculative proof of lost profits. The wronged party may not be able to refer to its own track record in the particular market or that of anyone else.
In any event, a case cited by the plaintiff, National Farmers Org. v.Assoc. of Milk Producers, 850 F.2d 1286, 1293 (CA. 8, 1988), was an antitrust case where the court said that although a higher standard of proof is required to establish the "fact of injury" there is a "lower standard of proof for establishing the amount of damage." This sounds fine except what does it really mean and is the standard really different from that applied in any case where lost profits are claimed? Thus, after the previously mentioned remarks the court goes on to say: "Therefore, in proving the amount of damage, the antitrust plaintiff need only present evidence from which the fact finder may make a just and reasonable estimate of the damage that is not based on speculation or guesswork" — sounds an awful lot like "reasonable certainty," doesn't it? CT Page 2871
In fact, the special treatment of lost profit claims in antitrust cases appears to be an adoption of the so-called "soft approach" to evidence in consequential damage claims of which lost profits are a subcategory. As to these two approaches, Dobbs at § 12.4(3) pp. 69-70, says the following:
 "Hard approaches demand proof not only that damage was caused in fact by the breach (here, the alleged wrongful denial of the bid), but also that the amount can be inferred with reasonable certainty. Soft approaches may be demanding in the proof required to show that damage was in fact caused by the breach (the wrongful rejection of bid), but forgiving in the proof required to show the amount of damages. The soft formula is that once the plaintiff has proved the existence of damages, the amount need not be proven with precision. These approaches, however, express attitudes, rather than rules. Even the soft approach does not countenance speculation or an irrational guess about damages." (Emphasis added.)
At an earlier point, Dobbs says that: "This soft approach is usually accompanied, however, with an escape clause in which the court warns that it will not permit speculation," § 3.4, p. 320, see Bigelow v. RKORadio Pictures, 327 U.S. 251, 264 (1946) (antitrust case).
In the antitrust area a more helpful approach is perhaps to recognize new methods of proof or evidentiary approaches rather than play with language. In fact, that has been done. Speaking of antitrust cases at Vol. 3, § 12.4(3), p. 73, Dobbs states:
 "Competitor's and others' comparable experience, yardstick evidence. Antitrust cases initiated and developed the idea that evidence of past profits was not the only way in which lost profits could be proven. These cases developed the "yardstick" proof, in which the plaintiff is permitted to put on evidence about the profits of comparable businesses. When yardstick evidence or evidence of profits earned in comparable operations is well-structured and persuasive, courts take such evidence into account in contract cases as well as others." (But Dobbs goes on to say:)
 "Yardstick evidence seems most useful as a rational measure when the plaintiff's business bears a close CT Page 2872 comparison to another business which furnishes the yardstick, where the products or services involved are standardized, do not depend heavily on local or personal management skills, and where the plaintiff can show his share of the total market before breach. When the business profits depend on highly individualized elements, the plaintiff's own past experience may be the only reliable guide."
But of course the use of so-called yardstick evidence by plaintiffs is not confined to the antitrust area, see Beverly Hills Concepts, Inc., at247 Conn. p. 73, "experience . . . of third parties in a similar business."
Moving on from a more general discussion, what factors does our court refer to for evaluating "whether the plaintiff has proved lost profits to a reasonable certainty," Beverly Hills Concepts, Inc., 247 Conn. at p. 72. The court sets forth those factors at pp. 72-74:
 "A plaintiff's prior experience in the same business has been held to be probative . . . as has a plaintiff's experience in the same enterprise subsequent to the interference. . . . In jurisdictions that have been faced with assessing damages for the destruction of a new business, the experience of the plaintiff and that of third parties in a similar business have been admitted to prove lost profits . . . In addition, the average experience of participants in the same line of business as the injured party has been approved as a method of proving lost profits. . . . Similarly, prelitigation projections, particularly when prepared by the defendant, have also been approved. . . . The underlying requirement for each of these types of evidence is a substantial similarity between the facts forming the basis of the profit projections and the business opportunity that was destroyed." (Emphasis added by this court.)
 Beverly Hills Concepts, Inc. cited a Colorado case, Tull v.Gundersons, Inc., 709 P.2d 940 (1985), which has some informative discussion on the "prior experience in the same business" category and reinforces the just emphasized language in the quote from Beverly HillsConcepts, Inc. In Tull, the Colorado Supreme Court held that the trial court improperly excluded the plaintiff's "past profit experience on other projects," citing the Restatement (Second) Contracts § 352 comment b, the Tull court said, "Evidence of past performance will form CT Page 2873 the basis for a reasonable prediction of . . . future (profits)." But theTull court then immediately went on to say: "The admissibility of evidence of past profits is governed by the rule that "prior and subsequent experience must be comparable,'" see 709 P.2d at p. 945.
 (b)
Given these predicate factors that must be taken into account, could the jury be said to have reasonably concluded that there should have been a lost profit award of $500,000 in this case.
Suffice it to say that the plaintiff, through its president, Cheryl Terry, presented no experts, statistics, financial records as to costs or any information from which a reasonable calculation of lost profits could be made for this contract. She simply testified that she had been in the school transportation business for thirty years and her rate of profit was between 8 and 10 percent. Ms. Terry was a very candid witness, repeatedly said that she had done the calculation on cost for this bid over two years ago and did not have her records nor any present memory of any of the cost items that went into determining the expenses of completing the contractual obligations she was bidding for — she had no idea on the stand as to what her labor costs were, costs of insurance or workers compensation, cost of buses — she had some idea what new buses would cost but planned to use new and old buses, she did not know the cost of leasing buses. She could present no information on the cost of training and recruiting drivers but she said "absolutely" that could be an expense under the contract. She did not even know the number of drivers she would need to perform the contract. She did not have "the exact figures" on how much vehicle maintenance would cost. She did not have the figures for trial as to the cost of dispatchers, supervisors, management or overtime. Ms. Terry simply said at the time she bid for the contract she had figured out all these expenses and her standard rate of profit of 8 to 10 percent resulted from applying her calculations to this job. In effect, she told the jury the bid she put in was for almost six million dollars, that her standard profit rate was the percentages mentioned and the jury simply awarded her $500,000 applying those percentages to the contract price. In the court's opinion, that will not do. Profits are determined by subtracting expenses from anticipated revenue. Although expenses for a five-year contract cannot be calculated precisely in every category, some credible and concrete figures must be provided — she admitted at one time she had those very figures, she just did not bring them to court or no longer had them.
If the expense figures had been preserved and presented at trial, it would have been possible for the jury to have a non-speculative basis to CT Page 2874 determine loss profits. If some of the expenses could not be forecast exactly due to the length of the contract, then that would have been acceptable since a wrongdoer should not be able to rely on price fluctuations whose ambit can at least be calculated within certain, understandable limits. But this is not a case where the requirements of proof of lost profits should be relaxed because of the intricacies of proof presented by a complex antitrust case. The contract price was known, all that was needed was information about expenses which the plaintiff at one time admitted she had calculated. This rather is a situation where evidence that could have been preserved and presented was not offered in court and, without that evidence, there can be no reasonable basis for the jury's determination of lost profits.
Furthermore, the plaintiff's reliance on Westport Taxi Service, Inc.v. Westport Transit District, 235 Conn. 1 (1995), is misplaced. In that case, it was found that a transit authority violated the antitrust laws by engaging in predatory pricing against the plaintiff. In discussing this case, the plaintiff concentrates only upon the loss of business valuation aspect of the opinion at pp. 32-36. True, there is broad language about an owner of a business being able to testify about rates of profit and the value of his or her business, but this part of the opinion must be read in conjunction with the actual discussion of the lostprofits claim at pages 28-32. There, the court, to calculate lost profits, determined first the profit the plaintiff received when it directly competed with the defendant transit district (A) then it determined what the plaintiff would have received if the defendant had not competed with it and if it got the rate increases it requested. (B). Then it subtracted A from B to determine lost profits. But how did the court arrive at the base figure (A) representing what the plaintiff earned when it competed with the defendant? — "The trial court found, on the basis of the plaintiff's financial information, that the plaintiff earned a net profit of $5,795.12 during the year it competed directly with the defendant," id. p. 31. Presumably then, to arrive at this net profit figure from which lost profits were arrived at, the court had "financial information" to show "net profit" which must have included reference to actual expenses. What else does "financial information" mean? When the court went on to discuss the damages for loss of the business the court capitalized the B figure — what the plaintiff would have earned if it was allowed rate increases and did not have to compete with the defendant. This B figure was based on the net profit figure, A, which represented profits without any upward adjustments; but the net profit figure, A, as indicated, relied on the fact that the trial court took into account actual expenses in arriving at it.
But even if the foregoing analysis is misplaced because it is too rigid and the plaintiff argues it can show lost profits in a case like this by CT Page 2875 proving the amount of the bid and the rate of profit it traditionally received by running this business for over thirty years, there would still be a problem with the jury's verdict. The bare bones assumption just made still requires, at the very least, evidence that the Hartford project was a comparable project to the other school transportation jobs that the plaintiff had done in the past. As the earlier discussion indicated and Tull v. Gunderson, supra, cited with approval in BeverlyHill Concepts, Inc. indicated — "The admissibility of evidence of past profits is governed by the rule that "prior and subsequent experience must be comparable,'" 709 P.2d at p. 945. Hartford is a large urban city presenting school transportation factors not necessarily present in other towns or districts. To the court's memory, there was no evidence presented on this comparability issue. The plaintiff presented no evidence that the school transportation contracts it had performed in the past were anything comparable to the prospective Hartford five-year contract.
For the above-mentioned reasons, the court also concludes the verdict must be set aside for failure to prove damages to a reasonable certainty so that the jury verdict was based on sheer speculation.
Corradino, J.